## Richmond

KIRK REID COMPANY, INCORPORATED v. LOUIS B. FINE.

January 18, 1965.

Record No. 5817.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*George Pilcher, Jr.* (*Pilcher, Underwood, Pilcher & Winters,* on brief), for the appellant.

*Howard I. Legum* (*Fine, Fine, Legum, Schwan & Fine,* on brief), for the appellee.

CARRICO, J., delivered the opinion of the court.

This appeal and the litigation which gave rise thereto stem from a contract entered into between Kirk Reid Company, Incorporated, the complainant, and Louis B. Fine, the defendant.

In the contract, which was dated December 23, 1958, the complainant agreed to install, for the sum of $253,700.00, air conditioning and heating systems in the Law Building, owned by the defendant, in the city of Norfolk. According to a provision in the contract, the work was to be completed by May 1, 1959.

The contract, which was on a form approved by the American Institute of Architects, required the complainant to furnish all of the material and perform all of the work in accordance with drawings and specifications, made a part of the contract, which were prepared by Oliver and Smith, architects employed by the defendant. The architects and an independent engineer, James E. Hart, employed by them for this project, were, according to the contract, to have general supervision of the work.

The drawings and specifications, referred to in the contract, detailed the manner in which the work was to be performed and

specified the materials, in many instances by trade name, which were to be installed.

The complainant presented evidence tending to show that as soon as the work was commenced, it was discovered that the ducts, through which the air was to be carried from the conditioning unit to the upper floors of the building, could not be installed as prescribed in the drawings because of the presence of existing electrical conduits. It was also asserted by the complainant that the room which was designated to house some of the necessary equipment was of inadequate size. The complainant contended, in the trial court, that these difficulties rendered the contract impossible of performance and necessitated changes in the work and the equipment to be installed, resulting in charges for extra work in excess of the contract price. On the other hand, the defendant presented evidence to show that the plans and specifications could have been complied with as originally prepared.

There was serious conflict in the evidence relating to the complainant's authority to make the changes in the work.

The complainant presented evidence, in the form of statements contained in a letter written by the complainant to the defendant after the work was accomplished, to the effect that the defendant was informed of the necessity for the changes before they were made. However, the complainant's representative admitted on the witness stand that the defendant did not approve the changes, and the latter denied emphatically that he knew of any changes "until after the work had been completed, and when I had almost paid every cent under the contract."

The complainant attempted to prove that the changes in the work were authorized by Hart, the engineer, with the knowledge of the architects. However, it was shown that Hart had died after the work was completed but prior to the time of the hearings before the commissioner. Two letters, written by Hart to the architects after completion and which indicated his approval of the changes, were excluded by the commissioner. Oliver, the only one of the architects to testify, stated that neither he nor his partner, Smith, approved any changes in the equipment to be installed.

In any event, the work progressed to a conclusion, at which time the defendant had paid all but $14,473.00 of the contract price. On December 22, 1959, the architects issued a final certificate attesting that the complainant was entitled to the payment of the balance due under the contract. The defendant was presented with the certificate,

but he insisted that he be furnished with a "compliance certificate from the engineer and the architect and the materialmen who served the manufacturer" that the complainant "had delivered the tonnage" of air conditioning in the building. When the certificate was not forthcoming, the defendant refused to pay the balance of the contract price.

The complainant then filed a memorandum of mechanic's lien against the land of the defendant upon which the Law Building is located and later instituted this cause by filing a bill of complaint seeking a sale of the land to enforce the lien in the sum of $14,473.00 and a claim for extra work in the amount of $11,626.77.

The defendant filed his answer denying that he was indebted to the complainant and also filed a cross-bill praying for a judgment against the complainant for $75,000.00, alleged to be due because of the failure of performance and breach of the contract by the complainant.

The cause was referred to a commissioner in chancery who heard the evidence of the parties. He filed his report in which he found that the air conditioning system installed by the complainant failed to meet the contract requirements because it was 46 to 50 tons "short in capacity"; the primary air unit was of a lower rating by 7850 cubic feet per minute; the condenser water pump was 120 gallons per minute short of capacity; valves of inferior quality were installed; the size of water piping was reduced by two inches; pressure gauges and balancing cocks were not provided on pumps; the duct insulation was inferior, and there were "many other items of equipment which did not meet mandatory requirement of specifications."

Based upon these findings, the commissioner ruled that the equipment installed was much less expensive and smaller in size and capacity than that called for by the specifications; that the defendant's consent was never obtained for any changes, major or minor; that there were substantial deviations from the contract requirements; that the complainant had knowingly departed from the plans and specifications so that there was no substantial compliance with the terms of the contract, and that the difference in cost between the equipment contracted for and that which was installed amounted to $24,252.50.

In his report, the commissioner recommended that the bill of complaint should be dismissed, "and that damages against the Com-

plainant should be awarded in favor of the Defendant . . . in the amount of $24,252.50."

Both parties filed exceptions to the commissioner's report, which were overruled by the chancellor. A final decree was entered dismissing the bill of complaint and entering judgment on the cross-bill in favor of the defendant against the complainant in the amount recommended by the commissioner. The complainant was granted an appeal.

On this appeal, the complainant has not pressed its claim of $11,626.77 for extra work. It contends, however, that it was entitled to the enforcement of its mechanic's lien of $14,473.00 and that the defendant was entitled to recover nothing on his cross-bill.

The heart of the issue lies in the asserted authority of the complainant to make the changes in the work. The complainant concedes that the changes were made and does not question that they were of a major nature.

In argument before us, counsel for the complainant stated, "The question is not whether there was a change in the plans and specifications—the question is, did the architect and engineer have the authority to make the change?" The answer to the question is to be found in the provisions of the contract and the law applicable to a situation such as the one before us.

As has been noted, the contract between the complainant and the defendant provided that Oliver and Smith, the architects, and Hart, the engineer, were to "have general supervision of the work." Under such circumstances, the architect is not, by virtue of his employment, the general agent of the owner for all purposes in the work he is engaged to supervise. His authority is a limited one—defined by the terms of his contract of employment or by the terms of the contract between the owner and the contractor. He has no authority to make alterations in the plans and specifications nor to bind the owner with respect thereto except as provided in the contractual documents. *Smith* v. *Board of Education*, 76 W. Va. 239, 85 S. E. 513, 515; 5 Am. Jur. 2d, Architects, § 6, p. 668; 6 C. J. S., Architects, § 11, p. 304.

In the case before us, the only pertinent evidence relating to the status of the architects and the engineer is found in the contract documents entered into between the complainant and the defendant. What, then, were their provisions as to the authority of the architects and the engineer to make changes in the work contemplated by the contract?

The Supplementary General Conditions of the Specifications provided:

"For all sections of this specification, substitute the word 'Engineer' wherever the word 'Architect' is used."

Article 8 of the contract provided:

"The Owner may order changes in the work, the Contract Sum being adjusted accordingly. All such orders and adjustments shall be in writing . . . . "

Article 15 of the General Conditions provided, in part, as follows:

"In giving instructions, the Architect shall have authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purposes of the building, but otherwise, except in an emergency endangering life or property, no extra work or change shall be made unless in pursuance of a written order from the Owner signed or countersigned by the Architect, or a written order from the Architect stating that the Owner has authorized the extra work or change, and no claim for an addition to the contract sum shall be valid unless so ordered."

Article 38 of the General Conditions provided, in part, as follows:

"The Architect shall have general supervision and direction of the work. He is the agent of the Owner only to the extent provided in the Contract Documents and when in special instances he is authorized by the Owner so to act, and in such instances he shall, upon request, show the Contractor written authority . . . . "

Thus, it is clear that the authority of the architects and the engineer to act as agents of the defendant was of a limited scope, confined to those areas set forth in the contract and where, in special instances, their powers might be broadened. It is equally as clear that changes in the work, except of a minor nature, could only be made on the written order of the defendant or the written order of the architects or engineer stating that the defendant had authorized such changes.

It was conclusively shown that the defendant did not, at any time, in writing or otherwise, authorize or approve the changes in the work. It was just as conclusively shown that neither the architects nor the engineer ever issued a written order stating that the defendant had authorized the changes. Nor was there any indication that the powers of these limited agents were, in any special instances, broadened so as to constitute them general agents of the defendant.

There was, therefore, a complete lack of proof that the authority

for the changes arose from the previously quoted provisions of the contract.

The complainant, however, relies upon other portions of the contract which it says bestowed authority on the architects and engineer, as general agents of the defendant, to make the changes in the work without the approval of the latter. As well as the complainant's contentions can be pieced together from its brief, they appear to be as follows:

The complainant was required, under the contract, to "permit and facilitate inspection of the work by the Owner and his agents." The architect was authorized "to stop the work if necessary to insure its proper execution"; was obligated "within a reasonable time" to "make decisions on all claims of the Owner or Contractor and on all other matters relating to the execution and progress of the work or the interpretation of the Contract Documents," and was charged wtih furnishing "with reasonable promptness, additional instructions, by means of drawings or otherwise, necessary for the proper execution of the work." And, finally, the architects were empowered to issue certificates for payment to the contractor "for such amount as [they decide] to be properly due."

From all of this, the complainant argues that when the difficulties were encountered concerning the interference of the ducts with the electrical conduits and the size of the equipment room, the engineer, acting for the architects, made an inspection, found the contract to be impossible of performance and stopped the work; that the engineer then interpreted the contract documents, made a decision on the claim between the contractor and the owner, authorized a revision of the plans and furnished additional instructions by means of drawings issued on July 31, 1959; that the decision of the engineer was approved by the architects and was brought to the attention of the complainant, which made the changes at the engineer's direction; that the architects knew from the engineer that complainant was going to make the changes, and that, in any event, the issuance of the final certificate by the architects, stating that the balance of the contract price was properly due, was conclusive.

The difficulty with these contentions is that they are either not supported by the evidence or require the taking of an unreasonable view thereof; they distort the language of the contract upon which they are based, and negate the plain requirements of the other portions of the contract which must be given full effect.

There was no satisfactory evidence that the contract was impos-

sible of performance, and what evidence was submitted by the complainant relating thereto was in conflict with the positive statement of an expert called by the defendant that there was no such impossibility. That conflict has been resolved against the complainant and it is bound thereby.

There was no showing that the engineer stopped the work; that there was any claim, such as was contemplated by the contract, between the owner and contractor requiring a decision by the engineer, or that any interpretation of the contract documents was necessary.

The drawings of July 31, 1959, upon which the complainant places so great a reliance, were not issued by the engineer until after the air conditioning system had been completely installed. They were never approved by the defendant, and the evidence left serious doubt as to whether they were ever approved by the architects. The plans of July 31, 1959, were represented as being "as built" drawings of the air conditioning system but, even so, they varied in a number of material details from that which was actually installed. In short, the drawings were of little, if any, evidentiary value to the complainant.

The reliance of the complainant upon the final certificate of payment of the architects rests upon shaky foundations. That certificate was subject to the limitations of the same provision of the contract which gave rise to the authority of the architects to issue it. Article 25 of the General Conditions of the contract provided, in part, as follows:

"No certificate issued nor payment made to the Contractor, nor partial or entire use or occupancy of the work by the Owner, shall be an acceptance of any work or materials not in accordance with this contract. The making and acceptance of the final payment shall constitute a waiver of all claims by the Owner, other than those arising from unsettled liens, from faulty work appearing after final payment or from requirement of the specifications . . . ."

Moreover, the final certificate itself, upon its face, bore this language:

". . . [I]ts issuance, payment and acceptance are without prejudice to any rights of the Owner or Contractor under their contract."

But, whatever may have been said or done by the architects and engineer to lead the complainant to believe that they had approved the changes, their actions were in direct conflict with the provisions of the contract which required that written approval should be had

before major changes could be made. These contractual requirements were as well known to the complainant, and equally as binding upon it, as they were to the defendant and the architects and engineer. To the extent that the actions of the architects and engineer were in conflict with the provisions of the contract, such actions were in excess of the authority of these limited agents and, unless ratified by the defendant, not binding upon him.

The complainant says, however, that the defendant did ratify "the revision on the part of the engineer and architect" by remaining silent and not insisting "on the revision of the plans being referred to him for approval prior to the further execution of the contract."

This contention of the complainant apparently comes in the last inning of the game because, as the defendant points out, the record does not disclose that this theory was ever advanced in the trial court, nor is it mentioned in the assignments of error.

Be that as it may, this contention flies in the face of the evidence, accepted and acted upon by the commissioner and the chancellor, that the defendant never authorized the complainant, the architects or the engineer to make any changes, that he never approved such changes and that he "did not know there was any change in the plans and specifications until after the work had been completed."

Knowledge is the essential ingredient upon which the theory of ratification rests. One cannot be held to have ratified that about which he has no knowledge. The record before us simply does not support the contention that the defendant knew about the changes while the work was in progress, and he certainly did not ratify them after he was given such essential information.

We must conclude that the complainant made the changes in the work without the proper authority and that it deviated substantially from the requirements of the contract, to the damage of the defendant.

This brings us to a discussion of the complainant's final contentions, that is, that the commissioner and the chancellor erred in the method employed in assessing the defendant's damages and in refusing to allow the complainant credit for the unpaid balance of the contract price.

The commissioner, in his report, mentioned the "cost rule" and the "value rule" in computing the amount of damages to be awarded the defendant. He had reference to the two methods of determining

damages in building contract cases which were discussed in the case of *Mann* v. *Clowser*, 190 Va. 887, 904, 59 S. E. 2d 78, as follows:

" 'Where the contractor fails to keep his agreement, the measure of the employer's damages, whether sought in an independent action or by recoupment or counterclaim, is always the sum which will put him in as good a position as if the contract had been performed. If the defect is remediable from a practical standpoint, recovery generally will be based on the market price of completing or correcting the performance and this will generally be shown by the cost of getting (the) work done or completed by another person. If the defect is not thus remediable, damages are based on the difference between the value of the defective structure and that of the structure if properly completed . . . .' (Quoting from Williston on Contracts, Rev. Ed., Vol. 5, sec. 1363, pp. 3825-6.)

"Restatement of the Law of Contracts, sec. 346, p. 573, expresses it in this manner:

" '(a) For defective or unfinished construction he (the owner) can get judgment for either

" '(i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or

" '(ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste.' "

The commissioner determined the amount of the defendant's damages by deducting the cost of the equipment which was actually installed from what would have been its cost if installed according to the terms of the contract. While "cost" was thus mentioned, it is clearly apparent that the commissioner was actually applying the "value rule," that is, "the difference between the value that the [equipment] contracted for would have had and the value of the [equipment] that has been received by the [defendant]." There is no indication that the commissioner intended to recommend an award to the defendant of an amount sufficient to replace any of the equipment. Such would not have been justified because of the obvious "unreasonable economic waste" involved and because of the other factors present in the case, to be mentioned later.

As was said in *Mann* v. *Clowser*, *supra*, "The rule to be followed in a particular case depends upon the character and extent of the defective construction." (190 Va., at p. 904.) We find no fault, under

the circumstances, with the method employed to compute the defendant's damages.

Whether the complainant should have been allowed a credit for the unpaid balance of the contract price against the computation of the defendant's damages presents, however, quite a different question.

The commissioner ruled, and his conclusion was approved by the chancellor, that because the changes were "knowingly" made by the complainant, it had not substantially complied with the contract and was, therefore, "barred from recovering anything." But, in barring the complainant's recovery, the commissioner and the chancellor refused to credit the balance of the contract price against the damages found to have been sustained by the defendant. In this action, we are of opinion that the final decree of the chancellor was in error.

In his ruling, the commissioner relied upon the annotation in 6 A. L. R. 137 which states, in part, as follows:

"By the weight of authority a building contractor who wishes to take advantage of the doctrine of substantial performance must not be guilty of a wilful or an intentional departure from the terms of his contract. If he wilfully or intentionally departs from the terms of the contract, either in materials or work, he is barred from recovering anything."

The commissioner also cited the rule laid down in the Massachusetts case of *Bowen* v. *Kimbell*, 203 Mass. 364, 89 N. E. 542 (where the case is reported as *Dodge* v. *Kimball*), as follows:

"Intentional departure by contractor from terms of the contract in quality of plaster was conclusive against the builder's right to recover."

We have examined the earlier cases in which the rule relied upon by the commissioner has been followed. They ordinarily involved the single claim of the wilfully departing contractor against the owner, without an offsetting claim by the owner for the deviations. Also, they generally involved instances where the actions of the contractor were so extreme as to constitute bad faith or fraud.

The more recent annotation in 76 A. L. R. 2d 805 and the cases there cited indicate a relaxation of the rigid rule enunciated by some of the earlier decisions. This is especially true where the contractor and owner assert offsetting claims against each other, or where the departures from the contract do not involve real instances of bad

faith. This trend appears to have had its beginning with the adoption of the Restatement.

Of special interest is the fact that the Supreme Judicial Court of Massachusetts, upon whose previous decision in the case of *Bowen* v. *Kimbell, supra*, the commissioner relied, has, in two recent cases involving claim against counterclaim between contractor and owner, reconsidered its position with regard to the "no recovery" rule. In each case, the court allowed the contractor a credit for the unpaid balance of the contract price against the owner's award of damages for "wilful departures" from the specifications of the contract. See *Ficara* v. *Belleau*, 331 Mass. 80, 117 N. E. 2d 287; *DiMare* v. *Capaldi*, 336 Mass. 497, 146 N. E. 2d 517.

We have not previously decided upon the application of the "no recovery" rule in building contract cases. We need not now decide upon its application in the instance of the single claim of a wilfully departing contractor against an owner without an offsetting claim by the latter. That is not the issue here. In the situation which now confronts us, because of its particular circumstances, we are impressed with and adopt the basis of the holding of the Supreme Judicial Court of Massachusetts in *Ficara* v. *Belleau, supra*, that:

"It is not the policy of our law to award damages which would put a plaintiff in a better position than if the defendant had carried out his contract . . . 'The fundamental principle upon which the rule of damages is based is compensation . . . Compensation is the value of the performance of the contract, that is, what the plaintiff would have made had the contract been performed . . . . '

"The plaintiff is entitled to be made whole and no more. This is true in an action against a defendant for breach of contract, albeit a wilful one, even though the same defendant in suing as a plaintiff on the same contract might be barred by the rule of [no recovery]." (117 N. E. 2d, at pp. 289, 290.)

It is clear from the record before us that the sum of $24,252.50, awarded on the cross-bill, was considered by the commissioner and the chancellor to be the outside amount of the damages caused by the changes in the work. The evidence in this case requires that the complainant be allowed a credit for the unpaid balance of the contract price against that figure. To hold otherwise would put the defendant in a better position than he would have occupied if the contract had been performed with precise exactness.

Furthermore, there is nothing in the record to suggest, and the commissioner did not so find, that the actions of the complainant even

approached that modicum of bad faith which would, in effect, visit upon it the imposition of a penalty for its departures. The record would indicate that, rather than setting out to save money on the contract to its wrongful betterment, the complainant spent more to perform the work than it was called upon to do.

It appears from the commissioner's finding that "there was a workable air conditioning plant installed and operating by May 1, 1959," the time called for by the contract. It further appears from the record that the system so installed and operating has been used, since that time, by the defendant without complaint by him that it is insufficient to perform its task. Although this may not completely excuse the complainant for "knowingly" departing from the contract, it is sufficient reason not to impose what would be, under the circumstances, a harsh rule.

This is, after all, an equity cause. The result thus reached adjusts itself, in our opinion, more comfortably to equitable principles and is, at the same time, more closely conformed to the rules set forth in the quotations from Williston and the Restatement of the Law of Contracts.

What has been said disposes of the cross assignment of error of the defendant that he should have been awarded a greater amount of damages.

Accordingly, we modify the judgment awarded the defendant by deducting therefrom the unpaid balance of the contract price, $14,473.00. This action results in an award to the defendant in the amount of $9,779.50, for which sum a final judgment will be entered here. In all other respects the decree of the chancellor is affirmed. The defendant, having substantially prevailed on this appeal, will be awarded his costs.

*Modified and affirmed.*