WHITFIELD CONSTRUCTION, CO., INC., Plaintiff

v.

COMMERCIAL DEVELOPMENT CORP., and QUALITY SALES CORP., Defendants

and

AMERICAN AGENCIES, INC. and FIREMAN'S FUND INSURANCE COMPANY, Defendants to Counterclaim

and

COMMERCIAL DEVELOPMENT CORP., Plaintiff

v.

BELLANTE, CLAUSS, MILLER & NOLAN, JOHN R. GARFIELD and ROGER F. McCLOSKEY, Defendants

Civil No. 357-1970

District Court of the Virgin Islands

Div. of St. Thomas & St. John

April 18, 1975

657

658

CHRISTIAN, *Chief Judge*

MEMORANDUM

This suit was commenced by plaintiff Whitfield Construction Company, Inc. (Whitfield) on a claim against

defendants Commercial Development Corporation (hereinafter variously CDC, Commercial or Owner) and Quality Sales Corporation (Quality), for money due and owing on a construction contract and for damages flowing from the alleged breach of the said contract by the defendants. Commercial denied having breached their agreement and in turn counterclaimed against Whitfield for damages stemming allegedly from work left undone, as well as other work done in an unworkmanlike manner. Commercial's answer stated a multitude of counterclaims. Some involved parties then strangers to the suit. Accordingly, and on motion of CDC, two new defendants on the counterclaims stated were brought in, Fireman's Insurance Fund (Fireman's Fund) and American Agencies, Inc. (AA). The former is the bonding company which guaranteed Whitfield's performance under the contract. The latter is a subcontractor of plaintiff Whitfield which did some of the work provided for under the prime general contract.

Because of issues raised in a further amendment to Commercial's answer and counterclaims, the joinder of additional parties was found to be necessary. Entering the suit at this point were the architectural firm of Bellante, Clauss, Miller & Nolan (Bellante) which had served Commercial, as well as one John Garfield, an architect and the local agent of Bellante, and finally, an engineer at the time resident in St. Thomas, Roger McCloskey, who performed some of the engineering services entailed in the agreement between Commercial and Bellante. This multitude of parties, as would be expected, spawned a series of cross-claims. As necessary, the substance of them will be detailed in the narrative which follows.

Plaintiff in this suit sought injunctive and declaratory relief also. These aspects of the case came on for hearing on October 5, 1970, at which time plaintiff's principal effort was to prevent the defendants from taking possession of

the building until or unless they accepted it as fully completed. As a matter of actual fact, however, at the time of the hearing, defendants were already in possession and were utilizing the building. The up-shot of it all was a negotiated standoff pending final determination on the merits of the entire case. In halting the court proceedings in progress at that stage, the parties agreed that the sum of $60,000 found to be due plaintiff from defendant CDC, was to be paid. This was done. An additional sum of $5,000 was also handed over to plaintiff as due and owing, but $27,835.44 was placed in the registry of the court. This sum the clerk deposited in an interest bearing account to await the Court's final decision.

The issues remaining in the case after the above mentioned settlement came on for trial March 18 through 22, 1974. At the conclusion of the taking of testimony, all parties were given time to file post-trial briefs. The matter thereafter having been taken under advisement by the Court, and the Court having now considered the evidence adduced and the contentions of the respective parties, makes its findings of fact and conclusions of law as are set out below.

By written instrument dated October 28, 1967, Howard Rosov acquired a leasehold interest from the Government of the Virgin Islands in certain real estate located in the Sub Base, St. Thomas. This interest was to run initially for a period of twenty-five years, beginning on January 1, 1968, and was subject to two five-year options to renew, after which time it would revert to the Government. Rosov subsequently assigned this lease to Commercial, of which he was President, which in turn leased it to Quality Sales for the purpose of carrying on a food storage and sale business. Rosov is also an officer of Quality Sales, which is owned by International Food Sales Service.

On September 1, 1968, a contract was entered into between CDC and Bellante, by which the latter was to provide architectural services in the design and construction of the building to be used by Quality in its proposed business. The form of this contract was the standard AIA document between Owner and Architect, setting the ordinary bounds of the Architect's responsibility and authority. All transactions in behalf of Bellante were accomplished by and through John Garfield, Bellante's local representative. (Apparently certain aspects of the plans and specifications were submitted to Garfield, already drawn up, by a Dr. Paul Eaton. Although Eaton's status in this affair was never adequately clarified at trial, it does appear from the testimony that he was an agent of the Owner).

On June 7, 1969, Commercial signed a contract with Whitfield whereby Whitfield became the general contractor for the construction of the building. Both Ray Whitfield, President of the construction company, and his brother James, superintendent at the job site, testified at the trial. The documents of this integrated contract include, in addition to the written agreement and the AIA General Conditions, the Owner's Invitation to bid, the drawings, specifications and plans, and three addenda. Whitfield subcontracted the plumbing work to Tropic Plumbing, the electrical work to Rogers Electric and the fabrication and erection of the structural steel frame to American Agencies, Inc. Commercial directly contracted for the construction of the insulated freezer room with Carib Insulation Company of Miami, the millwork in the administrative office area to Amberg and the interior decorating requirements for the office area to Hans Kriek. The original contract price of $575,000 was modified by subsequent agreement to $525,000, removing certain aspects of the construction work from Whitfield and making it either the Owner's or an independent contractor's responsibility. This contract

662

stated that unless otherwise altered by Change Order, the date for the completion of the building was to be 290 days after the issuance of a building permit, and that time was of the essence. As originally planned, the building should have been completed by May 20, 1970.[1] Liquidated damages were provided for every day beyond that time that the Owner was deprived of occupancy and use due to delay attributable to the contractor.

In addition to the necessary triumverate of Owner-Architect-Contractor, and the previously mentioned Eaton, there were several other individuals involved in this construction project whose roles are not only ambiguous but whose presence cast the ordinary duties of the others in some confusion.

One Justus Villa, a civil engineer, was retained by Commercial sometime in 1969 as the "Owner's representative." Although this appears to be a position anticipated and recognized by the AIA as one apart from the Architect (See ¶2.2 of AIA Agreement between Owner and Architect), Mr. Villa himself appeared uncommonly unsure as to just what his role was supposed to be. When pressed, however, he repeated the precise language used by Rosov to commission him, words best omitted, but aptly described as blunt and colorful.[2] According to his testimony, he was to "assure the Owner that terms of the contract were being complied with," "to check and report to the Owner as to any deviations," and to "consult with both Owner and Architect

---

[1] Commercial, in its lease with Quality Sales, had agreed to turn over the premises to Quality Sales on March 1, 1970, with a provision for liquidated damages of $100/day in the event occupancy should be delayed. Note that despite this provision in the lease, it was executed well before the construction contract. CDC through Rosov nonetheless agreed with Whitfield that the date of completion would be May 20 of that year, two and one half months *after* possession was to have gone to Quality.

[2] Part of Mr. Villa's problem may have stemmed from a certain amount of crustiness on the part of Mr. Rosov, which crustiness surfaced from time to time throughout the testimony. Villa himself testified as to several occasions on which he seemed unable to get through to Rosov, or to make him see the urgency of his observations.

as to the realism for requests for payment," all this despite the fact that at no time was he given any written or oral authorization, to supervise. He was not acting under a written contract, and he characterized his understanding with Rosov as a gentleman's agreement.

His understanding of his function differs from that anticipated by the AIA documents, which provides:

> The Owner shall designate, when necessary, a representative authorized to act on his behalf with respect to the Project. The Owner or his representative shall examine documents submitted by the Architect and *shall render decisions pertaining thereto promptly, to avoid unreasonable delay in the progress of the Architect's work.*

Rosov confirmed the absence of any written contract between himself and Villa, and asserted that the latter was hired to keep him "informed as to the status of construction and as to what was happening and what was going on as an expert because [he] had no knowledge of construction per se." (Deposition p. 21.) Although it is clear that Villa's was not a supervisory position, he was nonetheless Rosov's (CDC's) agent. The relevance of Villa's precise status, as will be more fully shown infra, has to do with whether certain of his acts or omissions can be imputed to his employer, CDC, and therefore whether certain claims of CDC must fail.

Another mysterious cog in this complex wheel is Roger McCloskey. It is clear from both the testimony and correspondence in evidence that he was an engineer working with Garfield, responsible for the design of the floor slabs. The question arises, however, whether he is to be considered an agent of Bellante or as an independent contractor.

Whatever the ultimate resolution of these individuals' relationships with one another and the parties, it is undisputed that as the work progressed it was periodically riddled with disputes, increasing hostility, and lack of cooperation.

On February 10, 1970, there was a general work stoppage during which the masonry walls which were partially constructed, were torn down and re-designed. There is disagreement among the parties as to who ordered this stoppage, Whitfield and CDC blaming each other. Beside the major dispute as to who was responsible for the initial malconstruction and additional costs of re-design and construction, there is disagreement among the parties as to the effect of a memorandum agreement, dated April 3, 1970, which supposedly detailed the modifications to be made during the rebuilding.

After the wall dispute was settled sufficiently to permit the resumption of work, the job proceeded without further interruption. On August 3–4, 1970, an inspection was made of the premises by Ray Whitfield (contractor), John Garfield (Architect) and Marvin Goodman (for the Owner), after which Garfield sent Whitfield a letter stating that the building was in a "state of substantial completion except for the completion of the electrical system and resolution of the problems involved with the cracking plaster on the freezer wall," and containing the first punch list of things which remained to be done.

On August 4, before this letter was drafted, the ceiling in the freezer area collapsed while three AA employees were working and standing on it. Several of the claims involved in this suit arise from that collapse.

Some time before the injunctive hearing of October, 1970, a certificate of occupancy was issued by Public Works, and after the court's ruling in that matter, CDC and Quality took over formal possession and started to conduct business, which they have continued to do, without interruption, to this day.

The major disputes in this case revolve around several distinct stages of the construction process. They are the pile driving operation; the laying and design of the floor

slabs; the design and construction of the masonry walls; and the refrigeration unit ceiling. There are, of course, virtually hundreds of other disagreements, the most important of which are discussed under the heading of Miscellaneous.

## I. Pile Driving

The foundation of this building, both as designed and as built, is set on timber friction piles which have been driven into the ground. It is the Court's understanding that this is a common means of construction, and one used often on this island. It is the contention of defendant CDC that Bellante, et al. were negligent in their design and supervision of the plans, and even more emphatically, that Whitfield did an inadequate job of driving the piles, rendering the basic foundation of the building fatally and dangerously unsound.

More specifically, CDC objects that the piles were made of the wrong material (wood),[3] not of the proper length, not driven deeply enough because of the utilization of the wrong formula, and driven with a "cold hammer." Naturally, Whitfield claims that all these charges are groundless, and that the piles were driven in a proper manner and are fully capable of sustaining the full design load of 313 psf.

Prior to the beginning of excavation, Rosov commissioned the Puerto Rico Testing Services, Inc.[4] to take soil borings, to conduct other tests regarding environmental factors, and to make recommendations as to the best manner of executing the foundation. The results of those tests are in evidence and were the subject of much debate dur-

---

[3] Much was made of this point at trial, that the recommendations in this report specifically said that timber piles were not recommended. However, pg. r of the report says, to the contrary, that such piles are indeed acceptable.

[4] Actually, prior to hiring Bellante, Rosov had retained the architectural firm of Kramer, Kramer & Associates to do the architectural work. Due to various circumstances, chief among them delay in procuring the lease from the Government, the architectural services were ultimately performed by Bellante.

ing the trial, especially as to the significance of the recommendations in terms of mandatory compliance. Commercial's first witness, Justus Villa, disapproved of the design, supervision and execution of the pile driving. He said that the driving criteria set out in the specifications were based on the so-called Wellington Formula, which he asserted has been discredited throughout the industry. Moreover, he said that even assuming the Wellington Formula were adequate for the job, by comparing the specifications and the driving log which had been kept by Whitfield during the pile driving operations, they were not driven to a sufficient depth. He asserted that at one point during his observation of the work, he noticed that piles were being driven with a cold hammer. He explained that the significance of this was that a "Delmag D-12" diesel hammer was used, which required a certain amount of warming up, and the full, requisite power could not be achieved until this had occurred. He further asserted that to his observation the piles had been driven "willy nilly" with no discernable pattern.

This testimony was directly explained, or at least countered, by Ray Whitfield, who explained that while they did not use a cold hammer for any of the actual blows, there is a period of time in which they used a cold hammer on each pile. This apparently has the double advantage of getting the hammer hot, and giving the earth a chance to settle around each pile before sending it to its ultimate depth. This particular practice was corroborated by another witness, Murray Beaman, a civil engineer from Miami who was called by Whitfield. He testified that the man who had done the pile driving in this instance, one George Bunnell, had done the same kind of work for him many times in Florida, that he had always done a good job, and that he clearly knew what he was doing. Beaman also testified as to the advisability of following the recommendations con-

tained in the sub-soil report, admitting that while one purpose of such reports is to make recommendations, they are also always in a standard form and are recommendations only. The clear implication from this testimony, as well as from that of other expert witnesses, is that the recommendations contained in the report are in no way mandatory, and are not incorporated into the plans and specifications drawn up by the Architect. In fact, one of the contract documents made clear that were the contractor to follow the sub-soil report, and his doing so result in some deficiency or failure, he could not avoid liability by claiming to have followed the recommendations of the report. Thus I can find no error in Whitfield's choice of timber rather than another kind of pile. This conclusion is bolstered by Par. 4:3:1 of the AIA Document A201, General Conditions of the Contract for Construction, which states that the contractor "shall be solely responsible for all construction means, methods, techniques, sequences and procedures. . . ."

The last expert[5] to testify on the subject of the piles, called by Bellante, was Michael Johns, an engineer from the District of Columbia whose credentials alone would take up two pages. Mr. Johns stated unequivocally that the piles were properly designed, properly constructed and should last at least twenty-five years.

■ Villa based his opinion that the pile foundation was inadequate on, inter alia,[6] his observation of certain crack

---

[5] There was one other expert witness called by Commercial, Julian Madison, who is a civil structural engineer from the States. Although Mr. Madison was qualified as an expert by the Court after a voir dire as to his credentials, during the course of cross-examination his familiarity with local conditions was so undermined that the bulk of his testimony was rendered useless.

[6] He also based his opinion on some test load experiments he did at the site on certain piles, both controlled and random. These tests, however, were extraordinarily complex, and of questionable reliability. It is doubtful whether in the long run a detailed discussion of them would be of any enlightenment to the record. It is enough to say that they conflicted with those taken by the Pittsburgh Testing Lab, whose results favored Whitfield. Commercial had hired that firm to conduct tests in order to ascertain the structural soundness of the pile foundations and floor slabs.

patterns at various critical areas of the building. Thus, for example, he said that cracks on top of the pile caps, especially in the marshalling area, proved that the foundation was under more stress than it could properly take. Beaman and Johns, however, were both of the opinion that such cracks were the result of settling, natural shrinkage, heavy use and age, and that they did not signify any defect in the construction of the foundation. In fact, these two witnesses both indicated that if the cracks were unnatural, they were a result of abuse by the tenant, in that pallet storage against the outside walls, extending upwards of fifteen to twenty feet, was pushing against the walls, which were neither designed nor built to take that kind of stress. This Court took a view of the premises, accompanied by counsel for all parties. Although we observed the cracks, we must necessarily rely on the opinion of the experts as to what they signify. The array of expert testimony was impressive, all parties having produced men of unquestioned qualifications in a complex field. Despite the high level of expertise many of these witnesses testified to diametrically opposed theories, and it is the difficult task of this Court to have to choose among them. To that end, we have weighed Villa's admitted ability and knowledge of local conditions against Beaman's and, especially, Johns' outstanding achievement and reputation in the civil engineering field, as well as their familiarity with subjects such as pile foundations with which Villa has had only passing and incidental contact. Coupled with the view taken by the Court and the undeniable fact that the building is still standing, not to mention withstanding the additional pressures caused by increased traffic from a new four-lane highway, we have come to the conclusion that the testimony of Michael Johns is the most believable. Although not conclusive, it is also noteworthy that it is buttressed by that of Beaman and

Whitfield, whereas Villa's stands practically alone, with Madison supporting him only slightly.

In assessing the gravity of the piling problem, it is instructive to note that CDC did not complain to Whitfield about the foundation until well after it had become clear that the parties would eventually find themselves in court. Neither the Architect nor Villa at any time told Rosov that it was being done incorrectly. Moreover, if the danger is real, Villa's attitude towards his responsibility seems to have been singularly cavalier. At trial he testified that as his job was only to observe the construction, not to design, he never voiced his disagreement with the pile driving criteria (for which he blames McCloskey, who apparently provided the formula). He stated that "just because the design was a little wrong, it was not necessary to tell Rosov . . . it's just that by the law of averages, if you're lucky it will be okay." Common sense would dictate that if the foundation were truly as precarious as was urged at trial, Villa as the Owner's representative would have made his opinion known at that time, and not have waited until litigation was imminent or indeed a fact. Moreover, Villa had, prior to this job, only an academic familiarity with pile foundations, as he had never before been involved in a job where they were used. Whitfield, on the other hand, was experienced in the area, as he had done the construction work on several local buildings which were built on pile foundations. I therefore find that both as to design and construction, the pile foundation is adequate. Since this is so, obviously the entire pile driving operation was properly supervised as well.

## II. Floor Slabs

■ The calculations and specifications for the floor slab design were done by McCloskey. These plans called for poured concrete floor slabs with a certain amount of reinforcing steel in them. Before the first pour, Whitfield pre-

pared the forms and reinforcing steel bars in conformity with the plans. Villa, however, observed that there had been an error in design and concluded that the steel would be inadequate for the job. When it was called to his attention, McCloskey confessed error and re-worked the relevant calculations to arrive at the proper steel quotient. To guard against the possibility of further error, both McCloskey and Villa personally supervised the actual pouring of the slabs, which were then performed by Whitfield. Nonetheless, Villa asserted at trial that even after the proper strength of the steel was rectified, Whitfield still positioned the steel incorrectly within the slabs. The tests of the Pittsburgh Testing Lab seem to bear out at least the conclusion that the reinforcement of the floor slabs still do not meet ACI building code requirements for reinforced concrete. The testing organization conducted load bearing experiments on the floor slabs, which are set out and described in Exhibits 37 through 39. The conclusions found at page 5 of Exhibit 37, admitted into evidence, are that "Based on the recovery of Point 4, the floor failed to pass the ACI static load test and cannot be loaded in service with the live load of 313 PSF for which it was designed. Points 2 and 3 are very near to failure." Despite this conclusion, we fail to see how the blame for this can be laid at Whitfield's door. As noted above, McCloskey is the one who readjusted the figures and formulae for reinforcement, directions which Whitfield followed to the letter. Moreover, Villa was present with McCloskey and Whitfield when the first, as well as subsequent pours were executed. In fact, there was even testimony that Villa borrowed someone's tape measure to make certain that the steel was in the correct position, the proper distance respectively from the top and bottom of the slab.[7]

---

[7] The original design called for a steel bar bent in such a way as to place part of the steel in the top third, and part in the bottom third, of the six inch slab. The steel in the revised plans were straight bars which were to be similarly positioned. Villa contends that it was, by and large, placed squarely in the middle, where it would be least effective.

Villa's participation in this procedure appears from all accounts to have been more than that of a mere observer, and if the positioning was wrong, at the very least he acquiesced. Nor, again, did he make an objection to those present at the site, or later to Rosov. It is an inescapable conclusion that the steel bars in the floor slabs were properly executed and, if they were not, the silence of Villa, as plaintiff's agent, as to any defect precludes CDC from claiming error.

From the time that Villa realized that an error had been made and so apprised McCloskey, the latter conceded his responsibility. By letter of April 29, 1970, he sent Whitfield a check for $500 as a downpayment on the $5,000 price adjustment necessitated by the new design.[8] Ray Whitfield rejected this proffer on the ground that he had no contract with McCloskey and that as far as he was concerned, he should be paid in full by CDC.[9] Rosov testified[10] that at no time during resolution of this problem was it expected of him to pay Whitfield for the additional work, as it was clear that the mistake lay with the engineer. There is dispute as to whether the Architect or CDC should pay for this extra steel. In a subsequent Memorandum Agreement which resolved yet another dispute (Memorandum Agreement of April 3, 1970), CDC promised to guarantee, and did in fact pay, Whitfield the full $5,000 for the additional steel. Although it is clear that CDC has no recourse against Whitfield for this money, the dispute is still open as to whether it is entitled to recoup this loss from McCloskey and/or his principal, Bellante.

---

[8] This sum also represented the cost of new cement which was to increase the strength of the concrete from 3,000 to 4,000 PSI, which adjustment was included in the new design.

[9] Whitfield also admitted on the stand, however, that had McCloskey's check been in the full amount, he would have accepted it in payment.

[10] Rosov's testimony, by permission of the Court, was in the form of a deposition, as his extreme ill health prevented his appearing personally at the trial.

## III. Masonry Walls

On February 10, 1970, work was stopped on all phases of the Quality Sales building. There is hot dispute as to which party was responsible for calling a halt to the work, but it is unquestioned that all operations ceased. At the time of the stoppage, Whitfield had been in the process of constructing the exterior masonry walls. Whitfield testified that before starting on the walls he had found what he considered to be a defect in the design. In an effort to cover for Garfield (Viz a viz Rosov), he told him on the job site that the walls did not meet the support requirements of the Southern Building Code and that tie beams[10a] would have to be added. When Rosov refused to pay for this change, Whitfield claims that he and Garfield reached a compromise and that Garfield permitted him, by means of an oral field change, to use thread-line as a means of welding the blocks together. Thread-line was a new form of adhesive glue put out by Dow Chemical, which glues blocks together rather than using a mortar system. The original plans had called for duro-wall, a "wire gadget" shaped like a narrow ladder, the function of which is to provide concrete block reinforcement. Although Villa had no memory of it, Garfield recalled being present at an experiment at the request of Whitfield to see how thread-line worked. Whitfield's position is that after that demonstration Garfield gave him permission, per field change, to use that means of construction.

After Whitfield had gotten a good portion of the wall erected, Villa noticed that they were not in conformity with the plans and specifications and notified Rosov of his observation. Rosov halted the work[11] and hired a Miami consult-

---

[10a] Throughout the testimony and correspondence concerning the walls, the appellations tie beams and bond beams seem to have been used interchangeably. For the sake of consistency in the body of this opinion, we shall use the single description tie beam.

[11] Although Rosov claims that Whitfield arbitrarily and wrongfully notified him that he was stopping work, Deposition, pp. 75-6, this assertion is not supported by the evidence.

ing firm to come down and examine the walls and plans. This Miami firm, H. J. Ross, Associates, re-designed the wall structure after extensive study.[11a] The dispute was finally settled and work resumed pursuant to a Memorandum Agreement dated April 3, 1970, whereby the walls were to be knocked down and rebuilt. The new design required tie beams, the necessity of which Whitfield had previously advised Garfield. This Agreement also called for an extension of sixty-five days in the completion date, bringing it up to August 7, 1970, and an increase in the contract price of $17,000.[12]

Despite all the changes wrought by the H. J. Ross design, Villa finds fault with the work as ultimately executed in that he says Whitfield still omitted the dur-o-wall. He contends that dur-o-wall was called for in the original plans, and to his knowledge was not eliminated by the April agreement. We agree with Villa that the modification agreement maintained the requirement of dur-o-wall, but only for the refrigeration and freezer portions of the wall. Although the precise trade name was not spelled out in the Agreement, it provides that "all walls associated with freezer and cooler spaces shall have standard galvanized ladder type joint reinforcement installed every other course." We recall that Villa described dur-o-wall as precisely that, "a wire gadget shaped like a narrow ladder," and therefore infer that that is what was meant in the above specification. The inference seems compelled that if the "Memorandum of Agreement" chose to mention dur-o-wall in connection with "[a]ll walls associated with Freezer

---

[11a] Although it is by no means clear, it appears that more than one additional firm was consulted. In Villa's Commentary, discussing the wall resolution (Exh. 36A p. 22/38), he refers to a Fellman-Reiff modification of the H. J. Ross solution, and at other places a Ross-Fellman solution is referred to. For brevity's sake, wherever I refer to the H. J. Ross design I intend it to include wall modifications designed by any consultant other than Garfield.

[12] This sum, as noted previously, also included the additional reinforcing steel in the floor slab and reinforced concrete, also for the slab. See text accompanying note 8 supra.

and Cooler Spaces" only, the intention was to eliminate it, presumably by substitution, from the other walls. We cannot agree, however, that Whitfield failed to construct those walls in that manner. Ray Whitfield himself testified that as far as he knows they complied with that requirement. Commercial has produced no evidence, other than Villa's testimony, to prove that Whitfield's knowledge is faulty. Since Whitfield recognized that dur-o-wall was called for, there is no reason to assume, as Villa would have us do, that in the face of that Whitfield, on his second chance to build the walls, still omitted it. We are unable to find that Whitfield omitted the dur-o-wall in the walls of the freezer and cooler spaces as they presently stand, and reject Commercial's argument that he did so. This being the only serious objection voiced by CDC regarding the rebuilt walls, we find that as rebuilt all walls conform to the April 3, 1970 writing.

## IV. Refrigeration Ceiling

On August 3–4, 1970, there was an inspection of the premises. The question is raised, at the outset, as to whether this was to have been a "final inspection" in terms of the contract, whereby the building, subject to a punch list, would be certified as being in a state of substantial completion.[13] In any event, some time on Tuesday, August 4, the suspended ceiling in the refrigeration section collapsed destroying most of the electrical work which was thus far installed. This phase of the work had been done by Carib Insulation, a now bankrupt Florida firm, which had a contract directly with Commercial. At the time of the accident, three employees of AA were working on the ceiling. CDC claims that the collapse was the direct result of

---

[13] As the target completion date was August 7, it's not unreasonable to infer that indeed the original purpose of that inspection was to certify substantial completion.

negligence on the part of these AA employees, and thus the responsibility of their general contractor, Whitfield.

According to one of the AA men, Ramon Luis Hernandez, the men were standing between the deck and the frame, on top of the frame, welding purlins. At the moment of the cave-in the ceiling was bearing the combined weight of Hernandez, his two coworkers, a welding cable and a forty pound purlin. Hernandez stated that the three men were spaced about ten feet apart (the frame itself was between 50 and 60 feet long), and were being, as they had been instructed, very careful, having been told by both of the Whitfields that the ceiling was weak. Further, the area where the ceiling started to give way was, by his testimony, about forty feet away from where the men were standing. This witness described the manner in which they hoisted the purlins up with a pulley, carried it to where it had to be welded, and then welded it.

There is some question of whether this ceiling, on which they were working, was meant to be weight bearing. It does appear, however, that in order to do certain electrical work there was no means of reaching the necessary height other than by standing on this structure.[14]

██ Villa admitted that even though it was not meant to be used as a floor, it should have been able to stand the weight of the installers and, by inference, any other workmen who needed to get up there. It is abundantly clear that at various points in time, many other persons other than these AA men had been up on the ceiling, including Villa himself. The electrical subcontractors from Rogers Electric, among others, had made use of the structure during part of their installation. The only evidence tending to directly connect the collapse to any negligence on the

---

[14] The ceiling in question was an aluminum structure suspended several feet from the actual roof of the building. It was designed this way in order to provide the proper insulation for the cold storage and freezer sections of the warehouse.

part of Hernandez or his colleagues, was testimony by Villa. He stated emphatically that he had seen these men "running full-tilt like animals" and that he had told Jim Whitfield Monday morning that they were going to cause severe damage to the building. He said nothing to the men, however, as he was of the opinion that to do so would have been "interfering," and that it was Whitfield's job to tell them to be careful, not his. Again, Villa's attitude seems to have been oddly unconcerned, and in this case it seems that his sense of tact, if that be the basis of his restraint, was not in the best interest of his employer.

Villa's testimony only, attributes negligence to the AA's employees. None of the other persons continuously present at the warehouse noticed any kind of reckless behavior on their part. Moreover, it is impossible to attribute sole control of the area to them, as other witnesses had at different times seen many other persons working and walking on the same ceiling. It is more logical to place the blame on faulty construction of the ceiling, for which the bankrupt (and non-party) Carib Insulation should be held responsible. Or, one could conclude that it was a cumulative weakness due to use and stress beyond that for which it was structurally designed. I find that the collapse was not caused by the presence or negligence of the AA employees, and frankly believe that all concerned should consider themselves fortunate that there was no personal injury or loss of life.

Tangentially related to the ceiling collapse is a disagreement as to the meaning of a letter written by Garfield to Whitfield August 5, 1970, the day after the incident. The portion of that letter at issue reads: "Please note that it is at the point of substantial completion except for the completion of the electrical system and resolution of the problems involved with the cracking plaster on the freezer wall." Also contained in that letter is a preliminary punch

list, setting out the items of work remaining to be completed. The contractor is attempting to hold the Architect and Owner to the characterization that the building was then in a state of substantial completion which, according to the terms of the General Conditions, is that point of the work when the construction is sufficiently complete so the Owner may occupy the structure, or designated portions thereof, for the use for which it was intended. In view of the fact that the refrigeration unit ceiling had fallen only twenty-four hours before this letter was written, destroying not only that portion of the work but a great deal of the electrical wiring and other aspects as well, it would be fatuous indeed to believe that Garfield meant to use the term in its technical sense as of the date of his letter. Whether for the purpose of computing the completion date or any other, it clearly cannot be said that at the time of this letter the building was substantially completed so that it could be used for the purpose for which it was built. More than likely what Garfield must have intended to say— and this would comport with the evidence as we view it— was that as of his August 3–4 inspection, prior to the falling of the ceiling, the work was substantially completed. To find otherwise would be to attribute to Garfield total unawareness on August 5, that the ceiling had fallen on the previous day, for us an incomprehensible proposition.

## V. Miscellaneous

In an attempt to show an itemized list of damages sustained by CDC through the fault of the other parties, Villa put together a series of "schedules" allegedly itemizing the work either not completed or executed in a faulty manner.[15] This list was admitted in evidence, but it cannot be used as proof of actual losses sustained. It was prepared, according to Villa, sometime in the spring of 1972 for the purpose

---

[15] A commentary to this list was admitted as Exhibit U.

of negotiating a settlement, and Villa himself stated that, in terms of how his figures reflected actual damages, "they would do for openers."

The size of Villa's list raises another point relating to the alleged gravity of the damages CDC claims. The purpose of a punch list is to show what items of work remain undone or to be corrected. It is only logical, and indeed necessarily so, that the punch list would decrease in volume until the point of acceptance and final completion is reached. In the instant case, however, as Ray Whitfield morosely pointed out in testimony, the punch lists proliferated, seemingly in geometric proportion, as time progressed. Moreover, items appeared on later lists which not only had never appeared before, but about which objections had not been voiced during the course of the work. The prime example of this is all the fuss about the piles, but there are scores of others.

Whitfield also pointed out that much of the work could not be completed because of the failure of the owner to provide certain items which it or its tenant by contract was to provide for Whitfield and his subcontractors. Parts of the electrical work were delayed for this reason, and it is interesting to note that a sizeable portion of Villa's list and of the later punch lists seek to penalize Whitfield wrongfully for this delay. Although this will be taken up more fully in connection with damages, it is fitting that a finding of fact be made acknowledging the fact that these ever increasing complaints tend to show a lack of cooperation, and perhaps even good faith, on the part of the Owner, CDC.

There are virtually hundreds of small items in dispute between Whitfield and Commercial. Most of these, however, are too meaningless to merit an individual finding and will be considered only, if at all, in the context of assessing damages.

At the end of the plaintiff's case, a motion was made by defendant Quality to dismiss Whitfield's action against it. As pointed out in Quality's post-trial brief, the only relief requested against it in any of the complaints on file relate to the injunction action, wherein it was prayed that Quality and Commercial be enjoined from taking possession of the building. That request was resolved by the Court's decision in 1970 granting the defendants occupancy. Nonetheless, defendant Quality was kept in the action through the completion of the trial and to this date for the reason that had CDC proved its claims for damages, Quality still would have been a necessary party. Thus, although the initial injunctive prayer against Quality was mooted by this Court's order in October 1970, it has not until now been proper to rule on Quality's motion to be dismissed as a defendant in this suit.

Quality's memorandum asserts that "the complaint is silent as to any charge against Quality for any of its actions which either directly or indirectly caused any damage to Whitfield." (P. 2.) This is not entirely true, for several of the punch list items which held up final acceptance were the delivery of equipment which was the responsibility of Quality. In the context of this suit, however, that failure must be attributed to Commercial which had the direct responsibility to Whitfield. Nor has Commercial cross-claimed against Quality. Therefore, the motion of Quality to have the action dismissed as to it will be granted.

■ Fireman's Fund is a party because it was Whitfield's surety on the construction bond. This fact was never denied in the pleadings. The insurance company has argued in its post-trial brief (p. 23) that in its second amended answer, Commercial chose not to include a sixth separate and distinct counter-claim against Fireman's Fund, which had been included in and responded to in the

previous pleadings. On the basis of this, and the fact that the surety bond itself was never offered in evidence, the surety claims that it is no longer a party.

We disagree. Despite its above assertions, Fireman's Fund had an attorney at counsel table who participated throughout the trial, and submitted a voluminous, post-trial brief, only the last paragraphs of which urged this argument. More important, however, is the fact that at no time during the course of the trial did this particular party move for dismissal of the action against it on this ground. In fact, at the conclusion of Commercial's presentation of evidence, the surety moved to dismiss only on the basis that it was not the contractor's responsibility to follow the recommendations of the sub-soil report, and therefore the surety, as the contractor, could not be liable to the owner for its allegedly improper execution. There is sound authority for the proposition that parties may waive any defects in the pleadings by not making the timely and necessary objections. We reject the argument advanced at this late date based on the pleadings and lack of proof. There was oral testimony of the surety relationship, and there was behavior and representation consistent with that relationship. Moreover, Fireman's Fund fully litigated the issues it belatedly claims were dropped by Commercial. Therefore, we conclude and hold that Fireman's Fund's liability on the construction bond is established, to the same extent as that of its principal Whitfield Construction Company, for whatever sums Whitfield is found to owe Commercial. This liability is, of course, limited by the rule that it cannot exceed the amount of the bond. 17 Am.Jur.2d Contractor's Bonds § 6 (p. 195).

Because we have found as a matter of fact that there was no defect in the design or execution of the pile foundation, that aspect of the case poses no legal questions. The same is not true for the floor slabs and masonry walls.

■ As was noted earlier, from the time Villa observed the error in the design of the floor slab, McCloskey admitted the fault lay with him and even tendered Whitfield a check for $500 as a downpayment on the increased cost of materials. Pursuant to the terms of the April 3, 1970, Agreement, CDC guaranteed and, in fact, paid the full amount to Whitfield, although apart from that agreement it was not obligated to do so. CDC now has a valid claim for that sum against either McCloskey or Bellante. The proper party from whom it can collect turns on the question of whether McCloskey was acting as an agent of Bellante or an independent contractor. If he was the former, Bellante is clearly liable to CDC for $5,000 for the additional steel and reinforced concrete in the floor slabs. If, on the other hand, McCloskey is found to have been an independent contractor, Bellante is not liable for his mistake and CDC may collect directly from McCloskey. The general rule of liability is that a principal is liable for the negligent acts of his agent, but not for those of an independent contractor. Dumas v. Lloyd, 6 Ill.App.3d 1026, 286 N.E.2d 566 (1972). Garfield stated at trial that since Bellante had hired McCloskey to do the engineering aspects of the Quality building, the architectural firm is responsible for his omissions. His voluntary admission, however, does not make it so, as the question is one of law.

The facts in Owings v. Rose, 497 P.2d 1183 (Ore. 1972) are almost on all fours with those of the case at bar. In that case the plaintiff architect sued the defendant engineer in an indemnity action for the money which it was obligated to pay in an out-of-court settlement with the owner of a building for which plaintiff had acted as project architect. The architect had hired defendant to do the engineering services for the design of the floor slabs, which had cracked severely. In Owings the court held, without discussion, that the defendant was not an independent contractor, and was

liable to the architect for the money it had paid to the owner for the losses sustained arising from the engineer's faulty design. In a footnote, however, the court distinguished that case from an earlier one, Johnson v. Salem Title Company, 246 Ore. 409, 425 P.2d 519 (1967). In Johnson, the court had held that an architect had a non-delegable duty to design a building in conformity with the safety requirements of the city building code. As stated in footnote 1 of Owings, 498 P.2d at 1187:

In that case [Johnson], *we assumed but did not hold,* that the consulting engineer who had actually designed the defective wall was an independent contractor and that the architect, his employer, would not normally be liable for his torts. Nevertheless, the architect was held liable in that case because his duty to design safely was held to be non-delegable. . . . The decision turned on the safety requirements of a building code, while here there is no contention that the floor was structurally unsafe or in violation of any applicable code requirements. (Emphasis supplied.)

Villa contended, and McCloskey conceded, that the calculations for the reinforcing steel and concrete in the floor slabs were so deficient as to completely violate the requirements of the Southern Building Code, a document much referred to during the course of the trial. The references, however, were largely due to the fact that many of the witnesses were accustomed to using that Code, and also that it was established by the specifications as the standard to be followed. Although there was some testimony to the effect that the Southern Building Code was incorporated into the Virgin Islands Code by reference, a thorough search of Title 29 and the accompanying Rules and Regulations proves this not to be the case. Other Codes specifically mentioned at trial, e.g., the ACI, are incorporated into the Virgin Islands Code by name, and perhaps the confusion stems from that. In any event, the Southern Building Code has not been so incorporated, and the failure of Mc-

Closkey's design to conform to its provisions cannot be transformed into a Johnson-type non-delegable statutory duty which would render Bellante liable for McCloskey's error.

■ The Restatement of Agency 2d, § 220, provides several criteria for determining who is an agent but not a servant, that is, an independent contractor. In terms of almost all of these factors, McCloskey falls within the category of independent contractor, and thus solely responsible for his own negligent conduct. There can be no doubt that his error in calculating the proper amount of reinforcing steel and concrete falls within that kind of behavior. There are ten such factual considerations listed; discussion of only a few will demonstrate the independent nature of McCloskey's employment.

■ (a) Extent of control which by the agreement the master may exercise over the details of the work. This is often described as the most crucial of the considerations. 41 Am.Jur.2d Independent Contractors § 6. An independent contractor agrees to accomplish certain results, but such contractor is not controlled in the details, manner, or particular method of performing the task, whereas an agent is subject to the control of the principal with respect to the details of the work. Id., § 7. The agreement between McCloskey and Garfield, scantily evidenced by an exchange of correspondence (Exhs. D-1 and D-2), shows that Mc-Closkey agreed to do the design work for the floor slabs and slab supports in consideration of $3\frac{1}{2}$ per cent of the structural cost.

This fits nicely with criterion (g) in the Restatement, the method of payment. Comment (j) provides that "If the time of employment is short, the worker is less apt to subject himself to control as to details and the job is more likely to be considered his job than the job of the one employing him. This is especially true if payment is to be made by the

job and not by the hour." See also 41 Am.Jur.2d Independent Contractors § 13. The method of payment in this case is strongly indicative of an independent contractorship.

Also strongly indicative is (d), the skill required in the particular occupation. Civil engineers such as McCloskey are a highly specialized group. Comment (i) states that, together with the effect of custom of the community, "the skill which is required in the occupation is often of almost conclusive weight. Unskilled labor is usually performed by those customarily regarded as servants . . . ." Conversely, one hired for a highly specialized skill, working under his own control on a well-defined aspect of the overall job, is properly an independent contractor. "The fact that work to be done is such as requires special skill for its proper performance has some tendency to show that the relation between the employer and the person employed is not that of master and servant."

McCloskey's work, as a consultant, may have been incorporated into Garfield's drawings and gone out under the Bellante name. Nonetheless, his was a minute proportion of the project which required a particular expertise and which, among the knowledgeable parties, was immediately recognized as his contribution to the work. We think McCloskey, under the circumstances, clearly fits the description of an independent contractor. It is to him, therefore, not Bellante, that Commercial must look for repayment of the $5,000 which the correction of his mistake cost. Commercial is entitled to this sum from McCloskey.

The work stoppage of February 1970 was called by Rosov because Villa informed him that the construction of the walls was not proceeding in accordance with the plans and specifications. The original specifications, as noted above, had called for the use of dur-o-wall, rather than threadline, used by Whitfield as a strengthening device. Although the H. J. Ross revision also called for the use of dur-o-wall

in the walls of the refrigeration and freezing units, it added the essential tie beams, which Whitfield says he from the start told Garfield and Rosov were missing. Despite the ultimate vindication of Whitfield's suggestion by Ross' inclusion of the beams, it is clear that the cessation of work was precipitated by Villa's observation of Whitfield's departure from the particular requirements of the specifications concerning dur-o-wall.

In determining who is liable for the costs flowing from the two month shutdown, it is necessary to determine first whether Whitfield was justified in substituting one means of wall reinforcement for another. This calls for an examination of both the substance of his "authorization" and the contract provisions.

Whitfield testified that because Rosov refused to pay for the addition of the tie beams, he and Garfield reached a compromise whereby the latter approved the use of threadline because of its demonstrated superior strength. Whitfield further asserted that this approval was forthcoming after both an experiment and a seminar on the subject which he, Garfield and Villa attended. He testified that after persuading Garfield of the suitability of the new product, Garfield agreed to its use by means of a verbal field change. It is the validity of that consent with which we are concerned.

Whitfield argues that the oral nature of the field change was proper because it did not affect the contract price or time of completion. The contract between Whitfield and CDC, however, included AIA Document A201, General Conditions of the Contract for Construction. That document contains the following language:

12.3.1: The Architect shall have authority to order minor changes in the work not involving an adjustment in the Contract Sum or an extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes may be effected *by Field*

*Order or by other written order*. Such changes shall be binding on the Owner and the Contractor.

12.4.1: The Architect may issue *written* Field Orders which interpret the Contract Documents in accordance with Subparagraph 1.2.5 or which order minor changes in the Work in accordance with Paragraph 21.3 without change in Contract Sum or Contract Time. The Contractor shall carry out such Field Orders promptly. (Emphasis supplied.)

As a general rule, the provision in a private building or construction contract that alterations or extras must be ordered in writing is valid and binding upon the parties, and therefore, so long as such a provision remains in effect no recovery can be had for alterations or extras done without a written order in compliance therewith. See generally Anno., 2 A.L.R.3d 620 (1965). The instant case differs significantly from the subject matter of that annotation, however, in that there the sole concern was with whether or not the contractor could recover for work done which differed from the plans and specifications but which was not approved by a written change order. Here, not only are we not concerned with recovery of the cost of work done, but we have a clear and explicit contract provision which provides for *written* field orders, even when there is no change in contract price or time.

[c]ontractors have no right to depart from working plans made a part of the contract. If they do so, it is at their peril and they become guarantors as to the strength and safety of the structures. The parties were clearly entitled to contract to have the buildings erected in accordance with certain plans and specifications. An express contract admits of no departure from its terms, and the [contractors] could discharge themselves from liability only by constructing the buildings in accordance with the plans and specifications, unless a deviation was mutually agreed upon. Robert G. Regan Co. v. Fiocchi, 44 Ill.App.2d 336, 194 N.E.2d 665, 668 (1963).

In cases where either the action was by the contractor for the balance of the contract price, or the owner was suing

687

for damages, the general rule is that a deviation from a specific requirement of the plans does not invalidate the whole contract, but only that the contractor may get his money minus the cost of repairing the deviation. See, e.g., Shemik v. Vogel, 105 N.W.2d 677 (N.D. 1960), in which the contract called for the contractor to put one inch of gravel on top of the roof, whereas he only put on 1/4 inch. Even though expert testimony showed conclusively that 1/4 inch was sufficient and reasonable for the intended purpose, the court held that the owner was entitled to exactly what was called for in the plans, not merely what was reasonable, and ordered the contractor to pay the owner for the cost of 3/4 inches more gravel plus the cost of labor for putting it on. Thus, Whitfield's claim that thread-line would be more effective under the circumstances, no matter how true, must fail, because CDC had the right to insist on the precise execution of the terms of the contract. See also Drummond v. Hughes, 91 N.J.L. 563, 104 A. 137 (1918); Clark v. Pope, 70 Ill. 128 (1873); 6 A.L.R.3d 1394, 1415 (Section 5).

Likewise doomed to failure is Whitfield's claim that because Garfield consented, with or without a written field order, he is relieved of any liability flowing from action taken on his own initiative. Although, for many purposes of this project, Garfield may be considered to be an agent of CDC, his agency must be interpreted within the confines of the various agreements among the parties. It has generally been recognized that in the absence of express authority, an architect, as such, has no power to waive or modify a stipulation requiring a written order for alterations or extras. 2 A.L.R.3d at 686; McNulty v. Keyser Office Building Co., 112 Md. 638, 76 A. 1113 (1910).

A somewhat similar factual pattern was present in the case of Kirk Reid Company v. Fine, 205 Va. 778, 139 S.E.2d 829 (1965), except there the architect was empowered to

orally authorize minor changes. In holding the contractor liable for not strictly conforming to the plans, despite the alleged approval of the architect, the court said:

[T]he contract between the complainant and the defendant provided that Oliver and Smith, the architects, and Hart, the engineer, were to "have general supervision of the work." Under such circumstances, the architect is not, by virtue of his employment, the general agent of the owner for all purposes in the work he is engaged to supervise. His authority is a limited one—defined by the terms of his contract of employment or by the terms of the contract between the owner and the contractor. He has no authority to make alterations in the plans and specifications nor to bind the owner with respect thereto except as provided in the contractual documents. 139 S.E.2d at 832.

Whatever may have been said or done by the architects and engineer to lead the complainant to believe that they had approved the changes, their actions were in direct conflict with the provisions of the contract which required that written approval should be had before major changes could be made. These contractual requirements were as well known to the complainant, and equally as binding upon it, as they were to the defendant and the architect and engineer. To the extent that the actions of the architects and engineer were in conflict with the provisions of the contract, such actions were in excess of the authority of these limited agents and, unless ratified by the defendant [owner], not binding upon him. Id., at 834.

Thus whether or not Garfield approved Whitfield's substitution of thread-line for the dur-o-wall, and the evidence does not clearly lean in that direction,[16] he did so without proper authority and could not bind CDC to accept its use. Even though the change, per se, in no way altered either the contract price or time for completion, it cannot be properly characterized, in our view, as minor. Commercial, in specifically requiring dur-o-wall, spaced in a particular

---

[16] In a letter to Whitfield, Garfield stated that the discussions between them on the relative merits of dur-o-wall and thread-line were brief, informal and for informational purposes only, and that formal permission to use the latter was never sought or granted. (Exh. B–11.) We cite this letter not as an adoption of Garfield's position, but only to illustrate the fact that the evidence is far from uncontroverted on even his alleged verbal approval.

manner, was seeking to guarantee structural strength. The specifications were worded to eliminate alternative methods. A change as to so vital an aspect of the project— the strength of the walls, some of them load bearing, must be considered nothing short of major. Thus, Villa and Rosov were within their rights when they called a halt to the work. As was stated in Kirk Reid Co., supra,

> It was conclusively shown that defendant [owner] did not, at any time, in writing or otherwise, authorize or approve the changes in the work. It was just as conclusively shown that neither the architects nor the engineer even issued a written order stating that the defendant had authorized the changes. Nor was there any indication that the powers of these limited agents were, in any special instances, broadened so as to constitute them general agents of the defendant. 139 S.E.2d at 833.

We thus conclude that Whitfield's use of thread-line, while perhaps prudent from a technical viewpoint, was improper in the absence of a written field change from Garfield. Consequently, we believe Whitfield is liable to Commercial for the cost of knocking down the original walls and rebuilding them. We think the case before us differs from those which hold that, even absent a written authorization for alterations or extras as required by the contract, a contractor may be compensated for extra work "where the necessity for the extra work results from acts, errors, and mistakes of architect or engineer or owner, under whose supervision work is to be done." Connersville Country Club v. F. N. Bunzendahl, Inc., 222 N.E.2d 417 (Ind. App. 1966). See also Bryan and Sons Corp. v. Klefstad, 237 So.2d 236 (1970); Erskine v. Johnson, 23 Neb. 261, 36 N.W. 510 (1888); 17A C.J.S. Contracts § 371(3). Here, while it is true that the new design incorporated the tie beams, which were definitely an omission chargeable to the architect, the initial reason for the shut down, valid from the start, was Whitfield's improper substitution of thread-line.

However, just because Whitfield is liable, and must deduct from its recovery against CDC the cost of razing and rebuilding the walls, does not mean that it must be responsible for all the costly damages flowing from the nine week shutdown.[17] Quite the contrary is true. Although Rosov from the beginning, was justified in demanding that the walls be done pursuant to the plans, he seemingly took advantage of his position by hiring at least one costly consultant to re-examine that whole phase of the construction. For this substantial item of damage, he cannot recover from Whitfield. Villa advised him of the specific objection, which could have been cured in a matter of a few weeks, if that long. Rosov gratuitously sought further advice which, in fact, confirmed Whitfield's alleged original suggestion that tie beams be added, a suggestion which Rosov supposedly rejected at the outset as being too costly. Whitfield cannot now be made to pay for the "penny wisdom, pound foolishness" of his contractee. Moreover, in determining the setoff on Whitfield's recovery for that amount which properly is owed to CDC, the setoff is to be reduced by that part of the overall cost which is attributable to the inclusion of the tie beams. They are an addition which Whitfield foresaw and of which he notified Rosov in good time. CDC cannot benefit from its own prior frugality. According to Villa's own assessment of damages and costs, this particular item cost $8,000. (Exh. 36, Schedule II, item i.)

We believe that Commercial is entitled to recover the cost of the H. J. Ross fee, plus that portion of the reconstruction which involved the addition of tie beams, from Bellante. As observed directly by Whitfield, and inferentially from the Ross design, the omission of tie beams was

---

[17] It is interesting to note that apparently even Commercial does not feel justified in shifting the entire cost of the delay to Whitfield. In its brief, it states that "the evidence is clear that all the damages flowing from the work stoppage was directly attributable to the improper design by the architect." (Post-trial brief p. 7.) As will be seen, we are in partial agreement with this allocation of fault.

an error which went to the basic soundness of the walls, and is directly traceable to the original plans and specifications. In fact, prior to the Ross revision, Garfield himself drew new designs which incorporated the tie beams. See Garfield letters to Whitfield of February 12, 1970 (Exh. B-6) and February 18, 1970 (Exh. B-7).

Plaintiff too seeks damage as a consequence of the work stoppage. He seeks special damages for costs which his company incurred from February through April of 1970. Included in this category is interest on a loan it took out from the First National City Bank to meet its costs, and certain items of overhead which had to be maintained even though the actual construction work had stopped.

Whitfield testified that through much of the hiatus in construction activity, while CDC was having outside consultants re-design the walls, it was obligated to keep its men on the payroll so that they would not take other work and therefore be unavailable when work recommenced. He testified that during the first two weeks of the stoppage he continued to pay his crew, many of whom had been with him for four or five years, which payments came to $10,000. After that, he was forced to let them go to find other work, and when he finally received word to return to the Commercial job, he had to go out and "round them up," finding, as he had feared, that not all of them were available. He considers this lay-off of his work crew, most of them highly skilled workers, one of the major reasons he was forced to discontinue his business after completion of this project.

Whitfield and his men were off the job for a total of 65 days, during which he was faced with certain constant overhead and administrative expenses which amounted to $2,454 per week, or a total, so he calculated, of $22,104.[18] In order to meet these expenses, Whitfield withdrew money from the corporate account and, when that was insufficient,

_____
[18] Our mathematics show that $2,454 for nine weeks comes to $22,086.

was forced to take out a loan of $75,000 from the First National City Bank. This note has been repaid in full, and all he claims here is the nine per cent interest which the bank charged him, amounting to $1,687.50.

Although no testimony was directly addressed to a breakdown of how much of that time was devoted to what, we observe from the myriad documents before us that as of February 18, 1970 Garfield had sent Whitfield two sets of drawings indicating his views on how to remedy and rebuild the walls (Exh. B-7), and that on February 26, he sent Whitfield another letter, the last paragraph of which required that the "non-conforming work shall be removed within two calendar weeks." (Exh. 12.) The work stoppage began the 10th day of February, for the sole purpose of substituting one material for another. It took sixteen days for Garfield's revisions to come through and still another full month until work resumed pursuant to the April 3 Memorandum Agreement, which recited that the wall drawings had been further revised as of April 2. We can find nothing in the material before us to indicate the date of the H. J. Ross drawings; we can only guess that it was sometime between the date of Garfield's and the date when work resumed.

Even though not universally accepted, overhead costs have been permitted as an element of damages, although it usually depends upon the measure of damages utilized. It is usually predicated on one of two theories. First, as part of lost profits; second, as reimbursement for costs incurred. Whitfield has not specifically advanced any theory for his claim, merely stating flatly that because of the nine week work stoppage, he was forced to pay certain costs which were not covered by incoming revenue.

The rule has been stated that "[i]f the plaintiff has wasted or otherwise incurred overhead expenses as a result of defendant's wrongful conduct, and the plaintiff seeks

to obtain reimbursement for such outlay, it has generally been held that the plaintiff's overhead expenses, to the extent to which they are reasonable and properly allocated, are recoverable as damages." 3 A.L.R.3d 689, 704 (1965). See also 13 Am.Jur.2d Building, Etc. Contracts § 50 (p. 53).

In Grand Trunk Western R. Co. v. H. W. Nelson Co., 116 F.2d 823 (6th Cir. 1941), reh. den. 118 F.2d 252, cert. den. 297 U.S. 717, plaintiff sought damages arising from the delay caused by defendant's fraudulent representation that it had obtained all the necessary easements, and attendant court proceedings. That court permitted recovery for overhead, which was defined as including salaries of executive officers, entertainment of prospective customers, the maintenance of a storage yard, traveling expenses, and "sundries." The court noted that

In computing damages for a construction contract, overhead expenses may be considered. These are not definable with precision, but may be said to include broadly the continuous expenses of the business, irrespective of the outlay on a particular contract. . . . The jury was not required to view appellee's loss as totally separate and apart from its general work. When the present delay resulted, a part of the general expense of appellee's business was incurred in the supervision of the employees and maintenance of the machinery and equipment on the job here in question and also to the injunction suits which produced the delay.

* * *

Overhead was one of the consequential expenses which the parties must have had in mind when the contract was entered into. 116 F.2d at 839.

And in M. H. McCloskey, Jr., Inc. v. United States, 66 Ct. Cl. 105 (1928), discussed at 3 A.L.R.3d 707, the court noted that the plaintiff had received the contract price for constructing the building and was not entitled to any damages for profits which it might have made. Nevertheless, the court held that the plaintiff was entitled to recover damages

694

for expenses which were paid over and above the expense which would have been incurred if the construction had proceeded without the delay caused by the defendant, including "the additional amount paid for overhead".

In a separate line of cases, many courts have held that an employer who was the object of an unlawful labor strike or slowdown was entitled to recover its overhead expenses from the delinquent union. Thus, in Union Tank Car Co. v. General Truck Drivers, Etc., L.U. No. 5, 309 F.Supp. 1162 (E.D. La. 1970), the court held that

> After excluding all expenses and disbursements not directly attributable to overhead expenses not necessary to continue the plant as a going concern in anticipation of the end of the strike, the evidence shows that during that period [plaintiff's employer] incurred necessary overhead expenses in the amount of $180,077 for which they received no production at all. This loss of overhead was . . . a direct and proximate result of the illegal action of the defendant union. 309 F.Supp. at 1175.

See also the cases discussed at Anno., 3 A.L.R.3d 689, Section 9 (1965).

We think, however, that all of the above cited cases can be distinguished from that at bar. The latter is different from the Union Tank Car case in that there was no "plant" or idle physical premises which had to be maintained. If Whitfield was paying for equipment at the construction site which lay dormant for the sixty-five days, there was no testimony to that effect. Further, and perhaps most important, the only evidence we have to work with is Whitfield's testimony as to what his costs were for that period. Those figures are unsupported by documentation. Totally absent is any testimony of by what, if any, percentage the funds coming into the business had diminished, or what percentage of the business's costs could be apportioned to this particular job. In terms of McCloskey, supra, it appears to us, lacking testimony to the contrary, that at least the staff salaries claimed here by Whitfield do not come within "expenses which were

*paid over and above the expense which would have been incurred if the construction had proceeded without the delay* caused by the defendant." (Emphasis supplied.)

In fact, the only item here claimed which seems to fall within that category is the $1,687.50 sought for the interest paid on the loan from the bank. This loan we are persuaded would not have been necessary had work progressed according to schedule, and Whitfield may recover this amount from Commercial.

Whitfield's testimony as to the wages paid to his work crew poses a contradiction. We note at the outset that he is not entitled to the wages paid during the first two weeks of stoppage, as the initial delay was his own fault. For the remaining seven weeks, however, he testified both that he had to let his men go to find other work, *and* that he continued to keep them on the payroll. Although we would think Whitfield entitled to any sums which he paid to workmen, during the period of the delay attributable to Rosov's superfluous consultation with H. J. Ross, to ensure their immediate availability when work resumed, we have nothing solid on which to base such an award. This claim must be rejected.

Whitfield is also claiming as damages the remainder of its contract price, which has not been paid by CDC, a sum of $31,181.44 plus interest. To this amount, minus any setoff found to be proper, it is thoroughly entitled. The building which it has allegedly constructed in an unworkmanlike manner, and which, if the despairing cries of the tenant were to be believed, is about to crumble on its very foundations, has withstood the tests of time, constant and heavy use, the construction and use of two heavily traveled, converging highways, uncommon floods, and the shock of an automobile crashing right into the building. It is inconceivable to us that a building the construction of which was

696

as faulty as is claimed here would have endured any one, let alone all, of these tests.

In its Complaint, Whitfield is seeking $300,000 over and above what is due on the contract for improper conduct and harassment on the part of Commercial. Presumably included in that amount are damages which Whitfield allegedly sustained after the conclusion of its role in the Quality Sales Building. Ray Whitfield testified that subsequent to the termination of this project he was unable to get bonding for other construction jobs, and that after six weeks of attempting to find other work, during which he kept his office and crew on the payroll, he moved to Florida where he now permanently resides. Exhibit CC was admitted into evidence. That is a letter to Whitfield from a local insurance agent, in which the agent advised Whitfield that because of the pendency of the instant litigation, he was unable to procure bonding for the Construction Company for any other work. For the six weeks during which he sought work before moving to Florida, Whitfield seeks reimbursement for his administrative expenses of $1,200 per week, or a total of $7,200.

 As with the overhead expenses Whitfield claimed for the duration of the work stoppage, these expenses cannot be awarded unless it is definitely shown that the loss of income was directly and proximately caused by Commercial, or at least by Whitfield's problems with Commercial. Although the letter admitted as Exh. CC does exactly this, we are convinced that for that purpose the contents of the letter constitute hearsay, as they are being offered to show the truth of the declarations contained therein. Mr. Juillerat, the agent, did not testify at trial, nor was any reason offered for his failure to do so. This letter may have been admitted for the purpose of showing that Whitfield *thought* he had valid reason to move to Florida, but it is not competent to prove the truth of those reasons and as-

sess damages accordingly. Finding ourselves unable to consider the letter for the purpose which, no doubt, Whitfield would urge us to, we find nothing in the record other than Whitfield's testimony which would justify this award.

██ However, we think this item differs from the overhead expenses sought earlier. Before, the construction company was a going concern, and there was no evidence that the Quality Sales project was the only one on which it was working. Thus, there was no means of separating overhead allocated to it from general business costs. In the instant situation, Whitfield gave uncontradicted testimony that the Quality Sales job was the last on which he worked, and that he could get no more work precisely because of the imbroglio it had become. Here, the overhead expenses are directly related to a lack of available work, and in turn, that lack is traceable to Whitfield's problems with Commercial. We stress that it is the proof of proximate cause of the alleged misconduct to the losses claimed that differs here. On the basis of Whitfield's uncontradicted and convincing testimony, we award Whitfield $7,200 for payroll and administrative expenses for the six weeks between his "completion" of the Quality Sales job and his relocating in Florida.

██ We note that the Complaint, regarding the $300,000 claim, alleges nothing more than harassment and improper conduct. No formal cause of action such as business interference was specifically pleaded, nor was it proved. Therefore, other than the above awarded business expenses, the claim for $300,000 must fail.

Even so, we are persuaded that Commercial's failure to honor pay requests, its unjustified addition to the delay in seeking outside consultation on the wall issue, and its evident attempts to hamstring Whitfield towards the end of the project, all tend to show a lack of good faith for which punitive damages may be allowed. We construe Whitfield's claim of "improper conduct and harassment" in connection

with its $300,000 claim the equivalent of specifically praying for punitive damages. We do not believe that Whitfield's minor deviations from the plans, or its fault in using thread-line, equalize the magnitude of Commercial's breach in refusing to meet the requests for payments which in some instances were approved by the architect but even then not paid by the owner. Among other things, we take into account the fact that before either a certificate of occupancy had been issued, or the Court had by its Order granted occupancy to Commercial, Commercial and Quality were moving supplies and material into the building in direct violation of their contract. I conclude that Whitfield is entitled to the sum of $50,000 as punitive damages.

Commercial, in its counter- and cross-claims, has sought the greatest amount of damages of any party to the suit. As I have found, in agreement with expert Johns, that the Quality Sales building is not only well suited to the purpose for which it was built, but is likely to stand for at least the maximum duration of the leasehold from the Government, I conclude that Commercial's claim for the cost of extensive repair is totally without merit. Other than the major areas of dispute, there was no evidence at trial whatsoever that indicated any deficiencies which hindered heavy and constant use of the building as planned and built, nor did our inspection of the premises bring any to light. Indeed, the experts almost uniformly agreed that the cracking in the walls, if abnormal at all, was caused by the abuse of the tenant in improperly stacking goods against the walls.

Commercial's list of items which were paid for and not done, or done improperly, and items which were neither done nor paid for, is gargantuan. This list was drawn up by Villa, allegedly taken in part from records he had kept all along but concededly in anticipation of litigation. This conclusion is apparent from the face of the report, in that it is titled "A Report on Itemization of Damages in re Civil No.

357-1970, District Court of the Virgin Islands." (Exh. 36.) It is further apparent, from a reading of that document and testimony at trial, that many of the items listed in that massive compilation were never brought to the attention of the contractor during the period that the work was being performed. Glaring examples of this are the itemized complaints regarding the pile driving operations. Because these "schedules" were prepared with an eye toward court proceedings, they were not admitted for the purpose of estimating the true cost of repair, nor will they be thus used. A further indication that they are not an entirely reliable source for cost estimates is shown by the obvious bias of the author, who throughout the Commentary (Exh. U) used terms such as "brazen violations" and "extorted from the owner." A few items contained in them, however, were discussed with greater detail in the course of the testimony, and these we can consider with less speculation.

A $10,000 item is claimed to repair cracks in masonry and to repaint. (Schedule II item 4.) Because we have found that the work has been executed in a workmanlike manner, it appears that by the date of this report, May 2, 1972, this item represents normal wear and tear of the building. This is not a proper item of damages. If this "defect" was in existence well before the time of the compilation of the list, it is possible that it might have been included in the one year general guarantee which Whitfield testified went with the building. Whitfield also said that at no time during the effective life of that guarantee did anyone from Commercial or Quality request that he examine or fix this particular item.

There was some contention at trial that plaintiff failed to construct a generator shed in compliance with the plans and specifications. We think that this omission was adequately explained when it was pointed out that not only was it not included in the original plans, but that Commer-

cial never designated a location for it. Further, the generator itself, which was to have been provided by Quality, was never delivered.

 Commercial is also seeking to throw the cost of the clean up, required after the collapse of the ceiling, on Whitfield because AA was a Whitfield subcontractor. This item cannot be allowed because Addendum No. 3 to the contract provided that the ceiling work was to be done by a direct contractor of the Owner, the cost to be borne by the owner. We have found that none of the parties to this action were responsible for that collapse, and it is more likely that the fault lay with Commercial's contractor. Nowhere in any of the contract documents is there a clause allocating risk of loss in the case of destruction. Therefore, we conclude that the cost of the cleanup must be borne by Commercial.

Another item claimed against Whitfield, reflected in Change Order No. 31, was for additional electrical work necessitated by the ceiling collapse. It was said at trial that this item was approved by Goodman (for the owner), but that Commercial in it "preserved its right in the event of litigation." This change order, as well as numbers 32 and 35, all pertained to rewiring for electricity after the collapse, and were given after Quality had been given possession of the building by this Court in October of 1970. Again, none of this is properly assessed against Whitfield.

One item of damage which is fairly well documented is for the aluminum windows which were placed in the building. Villa said that they did not conform to the specifications and, moreover, when he rubbed his finger against one on the second story, some material came off which should not have happened. In other words, he claims that the aluminum was not properly anodized.

 The deposition of Robert Silverstein was admitted in evidence (Exh. DD). Silverstein is president of Architectural Glass Products, a Miami firm which supplied the

701.

glass and aluminum products to Associated Glass, Whitfield's supplier. Silverstein stated that all the material supplied by him was of excellent quality, and in most cases exceeded that required by the specifications. On the other hand, there is in evidence a report of the American Standards Testing Bureau, Inc. (Exh. B), which concludes that certain test samples of aluminum sent to it from the Whitfield job were defective and failed to meet Aluminum Association Standards for Class II anodized aluminum architectural trim. In arriving at a finding with regard to this item, we weigh on the one hand the unquestioned expertise of the Test Bureau and the concededly self-serving characterization by Silverstein of the aluminum he provided as being of high quality. On the other hand, nowhere in the testimony can we find a foundation for locating from exactly where in the building the sample originated. Whitfield testified that Villa had complained about non-anodized aluminum in the second floor rest room windows which, according to Whitfield, were not required by the plans and specifications to be anodized. Although there is more evidence on the subject of this particular claim than on most others, there is still a total lack of evidence (other than Villa's compilation, incompetent for this purpose) as to the monetary value of this non-conforming work, if such it is. For that reason, as well as the fact that it is a minor discrepancy, we are unable to arrive at a dollar and cents award to Commercial that would not involve indulging in pure speculation.

The same problem obtains for all of the items enumerated on Villa's list, even were we willing to give them credence, which we are not. We agree with Whitfield that the punch lists, Exh. 36 being a culmination of them all, grew rather than diminished, and reflected more the bad faith of the owner than work improperly executed by the

contractor. We arrive at this conclusion by comparing the punch lists of August 5, August 19, September 4, and Villa's list, Exhibits 15, 17, 22 and 36, respectively. If we judge by the work not yet accomplished at the time the ceiling fell, we find that the vast majority of it was unfinished because of the failure of the owner to provide materials and items which were part of its obligation. The bulk of this relates to the electrical system, and in fact, Garfield, in the letter accompanying his first punch list of August 5 (Exh. 15), stated that "even though most or all of the General Contract work may have been accomplished to this point the building cannot be used for its intended purpose nor be considered substantially complete until the electrical system is available for use." A request by Whitfield to the owner regarding owner-furnished items was renewed on August 19 (Exh. AA), and on September 5, Whitfield sent Garfield still another letter which exhaustively details what work on the original punch list(s) had been done, and that what remained undone was due to failure of the owner to supply certain items and to act on change orders, some of which had been in its possession for over a month.

Based on the accumulative impression we get from all this mass of correspondence, and a lack of solid evidence as to the cost of remedying any minor work which has not been done, we can only conclude that any work which Whitfield did not do, or did incompletely, was through the fault of Commercial. There is an implied condition in every contract that each party owes the other a duty to cooperate to the fullest, and cannot be heard to complain if it has violated that duty. Natkin & Co. v. George A. Fuller, Co., 347 F.Supp. 17 (W.D. Mo. 1972). We find that, for whatever reason, Commercial towards the end of this project, more particularly after the collapse of the ceiling, breached its duty of cooperation. Whitfield's good faith has been

demonstrated at every turn,[19] and we will not penalize it for failures in execution which were put beyond its ability to correct by the owner itself.

 There still remains the matter of liquidated damages provided for in both the construction contract between Commercial and Whitfield, and in the lease between Commercial and Quality, as penalties for untimely completion and possession. CDC is seeking recovery from Whitfield for the penalties against it for its inability to give Quality possession by the date specified in the lease, March 1, 1970.[20] This we cannot permit, because even if Whitfield had completed the building in every respect as of the date he had originally promised, May 20, 1970, Quality still would have received possession two and one half months late. Rosov testified that during negotiations Ray Whitfield had told him there would be no trouble getting the building finished by the earlier date, and indeed, the contract does contain a clause providing for a bonus to the contractor for completion any time before the May 20 date. This type of clause, however, is not uncommon in construction contracts for commercial buildings. No memorandum or written evidence of the alleged "agreement" between Whitfield and Rosov has been produced, and not even Commercial has proposed that it constitutes a binding contract, or modification thereof. Thus CDC, through Rosov, knowingly contracted with Quality to perform what it should have known was impossible, in promising to turn over effective possession on a date certain to a building that was not only not yet

---

[19] Garfield himself observed, in a letter to Whitfield, that the attitude and cooperation of the General Contractor in dealing with and correcting these items has been very helpful." Exh. 17, letter of August 19, 1970.

[20] In actuality, the lease between Commercial and Quality directed that possession be given to the lessee January 1, 1970. It was only after a failure to provide occupancy by March 1, however, that the liquidated damages clause could be invoked. In fact, Commercial has paid damages under this clause to Quality's parent corporation.

constructed, but the construction contract for which had not even been signed.

 As for the alleged penalties caused by the delay in completion, the April 3 Agreement extended the target date by 65 days, to August 8, 1970. The collapse of the refrigeration ceiling intervened before that date, an event which, in the terms of the contract, was beyond the control of the contractor, and for which none of the parties can be held responsible. As of the date of the original injunction hearing, October 5, CDC and Quality were already in effective possession. The ceiling collapse, which threw all of the schedules out of kilter, was the responsibility of none of the parties to this action, and therefore the delay occasioned thereby cannot be attributed to any of them. We conclude that none of CDC's claims based on delay in the completion of the building are compensable.

Bellante, et al., are seeking from Commercial $16,868.51 plus interest, which sum represents unpaid fees under its contract with the owner, plus extra services required by the problems which have arisen. They are entitled to some of this amount, but their recovery must be limited to the sum which remains after the deductions indicated above, which they must pay to Commercial for corrections flowing from Garfield's mistakes.