**MANGANARO CORPORATION,**
Plaintiff,

v.

**HITT CONTRACTING,**
**INC., Defendant.**

Civil Action No. 00–401 (JMF).

United States District Court,
District of Columbia.

Jan. 22, 2002.

Sharon K. Engelhard, Howard Gary Goldberg, Goldberg, Pike & Besche, P.C., Baltimore, MD, for Plaintiff.

Joel S. Rubinstein, Andrew North Cook, Bell, Boyd & Lloyd, Washington, DC, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

### Introduction

This case arises out of a contract dispute between plaintiff Manganaro Corporation ("Manganaro") and defendant HITT Contracting, Inc. ("HITT"). Manganaro, a Maryland corporation, sued HITT, a Virginia corporation, for breach of contract arising out of a construction project for Lucent Technologies ("Lucent"). The Lucent project, located at Metropolitan Square, 1450 G Street in Washington, D.C., was to be performed on a fast-track basis. HITT, Lucent's prime contractor, hired Manganaro to perform the drywall and ceiling work on the 4th and 5th floors of Metropolitan Square. Due to the state-of-the-art "brutalized" architectural style, Manganaro was also contracted to install two speciality ceilings: 1) a radians ceiling and 2) a decoustics ceiling.

On December 23, 1999, after completing all of its work except for the installation of two ceilings and certain "punch list"[1] items, Manganaro notified HITT that it would cease performance on the contract until it was paid for the work previously performed. HITT denied that it failed to make timely payments and claimed that Manganaro abandoned the project. HITT, therefore, terminated Manganaro's subcontract and hired another subcontractor to finish the work.

In this lawsuit, Manganaro seeks what it claims is due from HITT. HITT seeks, as offsets or counterclaims, the costs incurred as a result of hiring other subcontractors to complete Manganaro's work and to repair alleged deficiencies in Manganaro's work.

### FINDINGS OF FACT

#### The Contract and its Addenda

1. On July 22, 1999, a contract was entered into by Manganaro and HITT in the base amount of $393,000.00. The original contract (prior to the addition of the addenda) stated that the "Contractor's receipt of payment by the owner shall be a condition precedent to the obligation of Contractor to make any payment to the Subcontractor." Defs. Ex. 0005, ¶ 2A. Thomas Vagrin ("Vagrin"), President of Manganaro, insisted, however, that the following be added to the contract: "Notwithstanding the above, it is understood The Contractor has the ultimate obligation to pay the Subcontractor within a reasonable time regardless of payment status from the Owner." Defs. Ex. 0010, ¶ 2A. HITT agreed to this modification of the original contract.

2. The addendum thus modified the original contract to require payment by HITT to Manganaro within a reasonable time after Manganaro's requisition for payment was received, eliminating any obligation of Manganaro's to await HITT's payment by Lucent before Manganaro was paid by HITT.

3. Vagrin testified that this addendum is typical of Manganaro contracts and is intended to protect Manganaro, typically a subcontractor, from Manganaro's not being paid within a reasonable time of the submission of its invoices to the general contractor.

4. Vagrin further testified that the addendum does not make a distinction between payments for "contract work" and payments for "change order" work.[2]

---

**1.** After a contractor finishes its work, the architect inspects it and can demand that the contractor make the repairs the architect lists on a "punch list."

**2.** "Change order" work is the result of design modifications initiated by the building owner

5. Yogen Patel ("Patel"), HITT's Vice President, conceded on direct examination that it was his understanding that Manganaro was to be paid in a timely fashion even if HITT had not yet received payment from Lucent.

**The Dispute and the Termination**

6. The work Manganaro invoiced consisted of two elements. The first, the "contract work," was work Manganaro was compelled to perform by the contract as written. Manganaro would bill for whatever percentage of it was completed in that month. The second, the "change order" work, was work that Manganaro had to do in excess of its contractual obligation. *See* note 2. Manganaro was permitted to seek additional compensation for the change order work.

7. At the midpoint of each month, it was Manganaro's practice to send invoices seeking compensation for both work done and work Manganaro projected would be completed by the end of that month. The requisition specified: 1) the original contract sum, (2) the net change due to "change orders," 3) the contract sum to date, 4) the total dollar amount of work completed to date, 5) the total dollar amount to date in earned retainage fees, 6) the total dollar amount to date in payments to Manganaro, and 7) the total dollar amount to date in outstanding payments currently due Manganaro. *See e.g.* Defs. Ex. 19028. Manganaro's monthly requisition also included information detailing the percentages of work completed and remaining to date and the dollar value of both percentages. *See e.g.* Defs. Ex. 19029.

8. Manganaro's change order work was subject to a separate and distinct approval process from the contract work. Initially, Manganaro would estimate in writing the cost of the modifications in terms of material and labor and submit a work order, along with supporting documentation, to HITT. If HITT approved the change order work, one of its representatives would sign the work order, and then Manganaro would proceed to do the work.

9. Next, HITT sent the change order work it had approved to the owner, Lucent. Lucent's approval of the work order, after the work was done, was crucial to Manganaro's getting paid. HITT's project accountant, Kitty Siegfried, testified that she could not pay Manganaro's change work orders until Lucent approved them. According to defendants' witnesses, Lucent was habitually and notoriously late in approving anything HITT submitted. Thus, HITT authorized Manganaro to do change order work, Manganaro did the change order work, but Manganaro did not get paid for it until Lucent authorized HITT to pay Manganaro.

10. To further complicate the matter, when it sent a check to Manganaro, HITT did not send an accompanying explanation of what it was paying. Vincent therefore assumed that the payment was for the contract work and believed that none of the money sent him was for the change order work. Adding to the confusion, Vin-

or architect. For example, the original contract might call for the installation of one kind of lighting fixture. During construction, however, the owner or architect might decide on a different kind of fixture which modifies the ceiling that was to be installed. These changes to the original contract therefore result in "change orders" or "change order" work.

cent at times made arithmetical errors in the calculation of the invoice. HITT corrected them but the record does not indicate that HITT advised Vincent of his errors when it sent the check.

11. Manganaro's first invoices, for July and August, 1999, were paid without problem or exception and Manganaro's work was moving rapidly towards its conclusion. In September, 1999, Manganaro billed HITT for the change orders listed in Chart 1 in the Appendix with an invoice that was submitted to Manganaro by a letter dated September 21, 1999 and that was due by October 21, 1999.

12. In October, 1999, HITT paid the two change orders which appear in bold in the chart, but failed to pay for the remaining nine items. This resulted in an outstanding balance of $18,574.18.

13. Even though these change work orders remained unpaid, HITT approved subsequent change orders and Manganaro billed for these by an invoice it submitted on October 14, 1999 and due by November 14, 1999. As of the date of the requisition, Manganaro had completed 100% of the work on the 4th floor and 86% of the work on the 5th floor for a combined 90% completion of the job. The new change work orders are set out in Chart 2 in the Appendix and total $38,767.50 (total less retainage). The October 14, 1999 bill sought payment for all outstanding change work orders, *i.e.*, the $18,574.18 carried over from September and the new, Octo-

ber changes or $38,767.50, for a total of $57,341.68.

14. On November 12, 1999, Vincent asked for a meeting with HITT personnel to review the status of numerous disputed change work orders that HITT had still not paid. Present at the meeting were John Przybyla ("Przybyla"), HITT Project Manager, Jason Sherman ("Sherman"), HITT Assistant Project Manager, Ken Whetzel ("Whetzel"), HITT Senior On–Site Superintendent, and Kevin Corbin ("Corbin"), a HITT representative. Agreement was reached as to numerous disputed tickets and Vincent testified that he was satisfied that Manganaro's concerns had been adequately addressed. He further testified that Przybyla apologized for HITT's being so far behind in their payments to Manganaro and that Przybyla promised to see what he could do to expedite payment.

15. Following the November meeting, Vincent sent a revised list of outstanding orders to Przybyla. When payment on the outstanding orders was not forthcoming, Vincent attempted to follow up with phone calls to Przybyla. Vincent testified that Przybyla did not respond to his calls.

16. On November 19, 1999, Vincent submitted a requisition for the month of November, 1999, indicating that $56,861 was due. Defs. Ex. 19059–60. In fact, this number was in error, and my independent calculations show that a total of $112,628.68 was due.[3]

---

**3.** This figure is arrived at by adding the September unpaid change work orders ($18,574.18—See Chart 1), the October unpaid change work orders ($38,767.50—See Chart 2), the November unpaid change work orders ($32,932.80—See Chart 3), and the unpaid contract work for the month of November ($22,354.20 = $24,838 less 10% retainage). Note that the $38,767.50 and $32.932.50 figures do not reflect payments made on December 9, 1999. Defs. Ex. 19059.

17. On December 9, 1999, HITT sent Manganaro a check for $19,871.07. Defs. Ex 19063. Again, in keeping with its practice, HITT did not accompany the check with an explanation of which change orders were being paid. Fortunately, there is in evidence a worksheet prepared by HITT's project accountant which indicates, by work order number, the change orders paid by this check and an adding machine tape that confirms this total. Defs. Ex 19066. As with so many of the documents at issue in this matter, the calculation of this bill contained several errors that I have attempted to correct.[4] Nevertheless, it is clear that some of the paid change work orders were allocated to the October and November invoices, thus reducing the total amounts due on these change work orders. The balance on the October invoice fell to $31,709.66, Chart 2, while the November outstanding change work orders stood at $20,671.83. Chart 3. Thus, after Manganaro received the December 9, 1999 check for $19,871.07, the total amount due, including contract work and change order work, fell from $112,628.68 to $92,757.61.

18. However, Vincent was not aware that some of the change work orders had already been paid when he demanded full payment of all of them in December, 1999. Indeed, Vincent only learned at trial that the December 9, 1999 payment represented a payment of outstanding change work orders. The significance of the December payment became apparent only after a painstaking reconstruction of the documentary evidence admitted at trial. The amount Manganaro was due for change order work on December 23, 1999 is different from what Vincent believed was due on that date. Nevertheless, while some of the change orders had been paid, many more were outstanding on December 23, 1999, the date when Vincent demanded payment of the outstanding ones and suspended work. In response, HITT terminated Manganaro's contract.

19. Vincent further testified that the only remaining work at that time was the installation of the two ceilings and any new punch list items. Although Manganaro was prepared to install the decoustics ceiling in the demonstration room on the 5th floor, Vincent testified that Whetzel never gave Manganaro final approval to install the ceiling. According to Vincent, Whetzel twice indicated that Manganaro should install the ceiling and then told Manganaro to stop its work.

20. The radians ceiling, costing $17,927.00, was shipped by Ceilings Plus to Manganaro on December 3, 1999. Defs. Ex.2002. Although Manganaro paid for the ceiling on December 30, 1999, the ceiling was received around December 23, 1999.

21. On December 20, 1999, Przybyla sent Vincent a letter outlining the remaining work to be done and the outstanding change orders. Defs. Ex. 6001–02. In the letter, Przybyla stated:

---

4. It appears that HITT's accountant overpaid several of the change work orders, underpaid several more, and made one glaring error by adding on $582.20 twice. These additional items are not allocated to any change work order. Nevertheless, since this amount was incorporated into the $19,871.07 check, I have accounted for these mistakes by ensuring that the total amount paid for the change work orders found in Charts 2, 3 & 4 equal $19,871.07. Thus, the "Unallocated Payments" row in Chart 2 reflects the amount needed to ensure that this figure was reached.

Manganaro must complete the installation of the Radian and Decoustic ceilings, as well as, all punch list items. We understand that you have the ceiling material at your Beltsville shop but are unwilling to start the required work. This letter shall serve as your formal notice of project delay. In the event that work on all remaining items does not start tomorrow HITT will begin to complete the work with our own forces. All cost associated with this delay will be the sole responsibility of Manganaro Corporation.

Defs. Ex. 6002.

22. By fax dated December 23, 1999, Vincent responded to Przybyla's December 20, 1999 letter. In the fax, Vincent outlined his understanding of the amount of work that remained and the total dollar amount of outstanding tickets. According to Vincent, of the original contractual amount of $393,000, outstanding payments were due in the amount of $135,462. More than half of that amount, $81,239, was due for outstanding change order work dating back to August, 1999. The only work remaining was the installation of the metal ceiling and final punch list items that combined amounted to a total labor cost of $14,903. In conclusion, Vincent stated: "As discussed, we consider a large portion of the balance due past due and request an agreed upon payment to be arranged prior to commencing." Defs. Ex. 8001.

23. Later that same day, Przybyla faxed Vincent a formal termination letter. Defs. Ex. 9003. In the letter Przybyla stated: "In accordance with article 7A of our subcontract agreement, this letter shall serve as your formal notice of termination. Since you are unwilling to finish your contract work we are currently making arrangements to complete all remaining items, including but not limited, to special ceilings and punch list." *Id.*

24. To recap, the amount due as of December 23, 1999, stood at $92,757.61. See ¶ 17. In addition, Manganaro had by that date submitted its December invoice, which billed for another $3,412.80 of change order work, of which only $552.20 had been paid. See Chart 4. In addition, $14,902 in contract work was also due. Defs. Ex. 19071. Thus, as of December 23, 1999, $92,757.61 was actually due and another $17,762.60 had been billed and was due by January 14, 2000.

**Counterclaims and Offsets**

25. Project progress meetings were held by HITT on a weekly basis. *See e.g.* Defs. Ex. 10001. According to the minutes for the November 1, 1999 progress meeting, Manganaro's work at that point was limited to patch and repair as well as the installation of two ceilings. Defs. Ex. 10004. At no point in the progress meeting minutes does HITT complain about the quality of Manganaro's work.

26. A second addendum to the contract between Manganaro and HITT contained the following provisions: (1) the cost of overtime work performed by Manganaro was to be covered by Manganaro only if Manganaro was the cause of the delay, Defs. Ex. 0010, (2) Manganaro was not responsible for repairing any damage to its work that is caused by others, Defs. Ex. 0010, and (3) HITT had to notify Manganaro 72 hours prior the issuance of backcharges to Manganaro for additional work, Defs. Ex. 0011. The purpose of this last clause was to allow Manganaro the opportunity to cure the defects that HITT originally backcharged and now seeks to assert

as offsets and counterclaims in this lawsuit.

27. Whetzel described the quality of Manganaro's work as good and never once complained about its quality while Manganaro was on-site and working.

28. John Hoffman, an employee of Stalker Brothers, the subcontractor that installed the ceiling and did punch list work after HITT terminated Manganaro, testified that he could not tell whether the repair work listed on the punch list was the result of deficient work by Manganaro in the first place or the result of damage done by others.

29. Cindy Athey, President of Precision Wall Tech, testified that the dry wall work was not properly done but also testified on several occasions during cross examination that she did not know who may have caused the damage to the walls that had to be repaired before they could be painted.

## CONCLUSIONS OF LAW

1. On December 23, 1999, Manganaro was justified in suspending performance due to the non-payment of no less than $92,757.61 in change order and contract work.

2. Since Manganaro was justified in suspending performance, HITT's termination of the contract was unjustified and constituted a material breach of the contract, excusing Manganaro from any further performance. Manganaro therefore has no obligation to pay for the completion of the work by others.

3. Manganaro was entitled to 72 hours notice prior to the issuance of back

charges by HITT to Manganaro for additional work. HITT never provided Manganaro with that notice once it terminated the contract on December 23, 1999.

## MEMORANDUM OPINION

██ Virginia law[5] acknowledges that a general contractor ("general") may or may not condition payment by the general contract to the subcontractor ("sub") upon payment to the general by the owner. If the parties intend the sub to wait for the general to be paid before the sub is paid, the contract is deemed to be a "pay when paid" contract. This forces the sub to keep working despite not being paid until the owner has paid the general. *Galloway Corp. v. S.B. Ballard Const. Co.*, 250 Va. 493, 464 S.E.2d 349 (1995).

██ As *Galloway* indicates, whether the contract is a "pay when paid" contract is a function of the parties' intentions. If the parties' intention is ambiguously expressed, parol evidence may be admissible to clarify their intention. *Id.*

There is neither patent or latent ambiguity in the addendum as it relates to HITT's obligation to pay Manganaro. HITT specifically agreed that it would pay Manganaro within a reasonable time whether or not HITT had been paid by the owner. Indeed, even if parol evidence were to be admitted, it is undisputed in this case that both parties to the contract understood the significance of the language in the addendum. Both Vagrin and Patel, signatories to the contract between Manganaro and HITT, understood that HITT's payment of Manganaro's requisitions was not conditioned on HITT's receipt of payment from Lucent. That HITT's accounting department failed to pay Manganaro because Lucent had not

5. HITT and Manganaro agreed that any disputes arising out of the contract are to be governed by Virginia law. Defs. Ex. 0008.

yet approved the work order that HITT itself had approved only shows that HITT began breaching the contract with Manganaro's submission of the third invoice in September.

 This was certainly not a "pay when paid" contract, and therefore payment was due when Manganaro billed HITT, irrespective of Lucent's approving or not approving the work orders. The first question is therefore when was payment due, since the contract did not specify a date certain.[6]

Vagrin testified that, in his opinion, it was reasonable for Manganaro to expect payment from HITT within 30 days of the submission of the invoice for the previous month's work. Vagrin's expectation of payment within that period of time was certainly justifiable given the parties' prior dealings, as illustrated in the following chart:

| Date of Manganaro Requisition | Date Requisition Paid | Number of days between Requisition and Payment |
|---|---|---|
| July 26, 1999 | Sept. 9, 1999 | 45 days |
| Aug.18, 1999 | Sept. 23, 1999 | 35 days |
| Sept. 21, 1999 | Oct. 21, 1999 | 30 days |
| Oct. 14, 1999 | Nov. 18, 1999 | 34 days |
| Nov. 19, 1999 | (not paid) | |

HITT's failure to pay Manganaro's July 1999 requisition within 30 days does not in this case affect the reasonableness of the 30–day window. On an average, Manganaro was being paid within 36 days for its contract work; the median was 34.5 days.

HITT seizes on this fact and asserts that the November 19, 1999, requisition was not past due when Manganaro ceased performance on December 23, 1999. That is, at best, half true. HITT paid for the contract work in a reasonably timely manner. But, HITT *never* paid for the change order work in a timely manner. By October 13, 1999, $18,574.18 was overdue and by November 14, 1999, a total of $ $57,341.68 was overdue. By December 23, 1999, the delay of at least 60 days in paying the September change order invoices and of least 30 days in paying the October change order invoices was unreasonable when one considers the practice of the parties.

Perhaps more significant is the amount outstanding when viewed absolutely or in relation to the total change order work billed. By November 19, 1999, Manganaro had billed $104,301.28 in change order work (less retainage) but had only been paid $14,614. (Note that payments listed in Chart 1 were made in October.) By December 23, 1999, Manganaro had billed $108,301.28 in change order work (less retainage) but had been paid $34,485.07. See Charts 1, 2, 3 & 4. That is as unfair as it is unreasonable.

 Since HITT's failure to pay the outstanding change order invoices by December 23, 1999, was unreasonable, Manganaro was entitled to suspend performance. While there is no Virginia case law on point, the authorities uniformly state that a subcontractor who is unreasonably denied payment as he progresses towards completion is justified in suspending performance until he is paid. *Restatement (Second) of Contracts* § 251(1) (1981); 15 Richard A. Lord, *Williston on Contracts* § 43.18 at 12 (4th ed.2000); 2 E. Allen Farnsworth, *Farnsworth on Contracts,* § 8:15 at 435 (1990).[7] Professor

---

6. While the Virginia Supreme Court has not spoken to the issue, it is generally true that, in the interpretation of construction contracts, the parties are deemed to have impliedly agreed that payment by the general to the sub will be made within a reasonable time. The determination of what is a reasonable time is a question of fact, involving consideration of the situation and intention of the parties and their actual performance of their contractual obligations. *E.g. In re: U.S. Air Duct Corp.,* 38 B.R. 1008, 1014 (N.D.N.Y.1984)(New York law).

7. A federal court exercising diversity jurisdiction must apply the law of the state in

Corbin, with his characteristic common-sense appreciation of the economic realities, states:

> There is a special factor to be considered in the case of a building contract, or any other contract the financing of which requires a progressive expenditure in the course of performance. In these cases, one reason for providing for installment payments as construction proceeds is to supply the funds necessary for the agreed performance; and failure to pay one or more installments is more likely to cause inconvenience and difficulty to the building contractor. Therefore, a failure to make one of the progress payments, even though the contract is not divisible into pairs of separate equivalents and the installment unpaid is only a small part of the whole consideration, is more likely to justify suspension of performance by the builder, or even total renunciation of further duty.

3A Arthur L. Corbin, *Corbin on Contracts* § 692 at 269 (1960).

Echoing that thought, a district court, construing North Carolina law, has stated:

> The Court has found that the defendants did fail to keep the periodic payments up to date as called for in the contract between Ling and Robinson and that it failed to make payments for a large portion of the extra work, change orders and speed-up ... The Court has therefore found that there was a substantial and material breach, said breach going to the very essence of the contract and justifying Robinson in refusing to con-

tinue work on the project. *The subcontractor cannot and should not be expected to finance the project until such time that the prime contractor or the government decides to pay the amount due. If the subcontractor is ordered to perform the work or even required to do so, then the obligation in the absence of an express contract provision falls upon the party so ordering the work to be done to pay a reasonable amount for that work within a reasonable time. To hold otherwise would cast a burden upon the subcontractor which in many cases would be impossible to carry as the subcontractors are usually smaller in size than the prime contractors.*

*United States for Use of F. E. Robinson Co. of N.C., Inc. v. Alpha–Continental,* 273 F.Supp. 758, 775–76 (E.D.N.C.1967)(emphasis added). *Accord: Stewart v. C & C Excavating & Const. Co.,* 877 F.2d 711, 713 (8th Cir.1989); (Miller Act case; acknowledging that failure to make progress payment may justify sub in suspending performance); *Blake Const. Co., Inc. v. C.J. Coakley Co., Inc.* 431 A.2d 569, 576 (D.C.1981). *See also Rodgers Co., Inc. v. Aztec Const. Co.,* No. 155591, 1997 WL 1070464 (Va. Cir. Ct.1997) (Virginia trial court concluding that failure to make payments under contract that authorized sub to suspend performance until payment was made on all outstanding invoices justified sub suspending performance; failure to pay was material breach).

 Similarly here, Manganaro had every right to suspend performance when it

---

which it sits, *see Erie R. Co. v. Tompkins,* 304 U.S. 64, 78–79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and in order to determine state law, the federal court must follow the decisions of the state's highest court, or, where the law is unclear, predict how that court would rule, based on "canons of construction, restatements of the law, treatises, recent pronouncements of general rules or

policies by the state's highest court, well considered dicta, and the state's trial court decisions," among other things. *Wells v. Liddy,* 186 F.3d 505, 528 (4th Cir.1999), *cert. denied,* 528 U.S. 1118, 120 S.Ct. 939, 145 L.Ed.2d 817 (2000).

*Moorehead v. State Farm Fire & Cas. Co.,* 123 F.Supp.2d 1004, 1006 (W.D.Va.2000).

was not paid and HITT's problems in obtaining approval from Lucent are not Manganaro's concern. Had HITT wanted this to be a "pay when paid" contract, it did not have to accept the addendum that required HITT to pay Manganaro irrespective of payments or approvals by Lucent. HITT cannot, after the fact and inequitably, convert the contract it signed into one it wished it had. HITT approved the work Manganaro did in advance of its being done and accepted it without complaint. Surely, HITT should pay for that work now.

HITT nevertheless argues that it was merely slow in paying Manganaro and that the delay was not a material breach of its contractual obligations to Manganaro. HITT further argues that its delay did not justify Manganaro's cessation of its performance and therefore Manganaro was the breaching party.

■■■■ Since at least 1895, Virginia has accepted the principle that not every breach of a contract justifies the other party's refusal to perform. Instead, a party who has substantially performed his obligation may insist upon performance by the other party provided the party demanding performance has merely breached his contractual obligations in a trivial manner that can be remedied by awarding damages for his non-material breach to her opponent. *Buena Vista Co. v. McCandlish*, 92 Va. 297, 23 S.E. 781, 783 (1895). *Accord: Neely v. White*, 177 Va. 358, 14 S.E.2d 337, 338 (1941); *Kirk Reid Co. v. Fine*, 205 Va. 778, 139 S.E.2d 829, 835–836 (Va.1965); *Wallinger v. Kelly*, 136 Va. 547, 117 S.E. 850, 855–856 (1923); *Smith v. Packard*, 94 Va. 730, 27 S.E. 586, 588 (1897); *Toepfer Const. Co. Inc. v. Abramson Family Partnership*, No. 156055, 1998 WL 972149 (Va. Cir. Ct. March 25, 1998); *Old Line Const. Corp. v.*

*Tribby*, 1990 WL 751065 (Va. Cir. Ct. Feb. 12, 1990). The corollary is that if a party has materially breached the contract in a manner that goes to the very root of the contract, he cannot then terminate his performance and demand that the other party perform.

HITT attempts to invoke this principle by equating itself to parties [8] victimized by another party's abandoning performance based on a breach ultimately deemed to be immaterial. HITT analogizes this case to a situation in which the parties are engaged in a legitimate dispute as to the amount due, the quality of work performed, or another equally legitimate reason for delaying payments. Courts may conclude that the good faith and justifiable delay required more patience than the abandoning party showed. In those situations, however, the party victimized by the abandonment had substantially performed its obligations. This substantial performance makes the abandonment unreasonable, because the abandoning party would have been compensated in damages for the understandable delay it encountered. Thus, after one applies the principles of "substantial performance" to this case, it is clear that HITT's reliance on these principles and the cases articulating it makes little sense.

First, Manganaro never abandoned its duty to complete its contractual obligations. It merely suspended performance and demanded payment of what was due. It was HITT that fired and terminated Manganaro. Since it did, I do not understand how HITT could claim that it substantially performed its obligation to Manganaro by firing Manganaro when it demanded payment as a condition precedent to proceeding with the remaining work.

---

8. *See, e.g., In re Jandous Elec. Const. Corp.*, 1989 WL 81139 (Bkrtcy.S.D.N.Y.1999); *In re* *Fordson Eng'g Corp*, 25 B.R. 506 (Bkrtcy. E.D.Mich.1982).

■ Second, as HITT ignores, the contract specified that "time was of the essence," a phrase that means what it says, i.e., that the parties are agreeing that the time within which a party performs its obligation to the other is a material part of their agreement. *See United States ex rel Virginia Beach Mechanical Services, Inc. v. SAMCO Const. Co.*, 39 F.Supp.2d 661, 672 (E.D.Va.1999) (failure to make timely payment may be material breach of construction contract if parties agree that time is of the essence). As Williston points out, the generosity of permitting a breaching party to recover despite his insubstantial breach will never be permitted to modify the contract the parties in fact created by their mutual assent. Williston, *supra*, § 44.53 at 224. While the incantation of the phrase "time is of the essence" should not lead to a result the parties did not fairly contemplate, Manganaro specifically demanded and received the assurance in this instance that Lucent's delays in paying HITT would not be a basis for HITT's delays in paying Manganaro. To permit HITT to escape from paying Manganaro in a timely manner because of Lucent's failure to approve and pay the change work orders in a timely manner is to deny Manganaro the very contractual benefit HITT gave it and to permit HITT to do exactly what it contracted not to do.

■ Third, any breach excused because of a party's substantial performance of his other obligations must pertain to an obligation that does not truly deny the other party the benefit of its bargain. *See* Corbin, *supra*, §§ 703–706 at 317–326; Williston, *supra*, § 44–52 at 220 ("The doctrine of substantial performance is intended to protect the right to compensation of those who have performed in all material and substantive particulars, so that their right to compensation may not be forfeited

by reason of mere technical, inadvertent or unimportant omissions or defects."); *Restatement, supra*, § 237 (referring to "uncured material failure" to render performance) & § 241 (listing significant factors in determining materiality of performance not rendered). I can only hope that HITT is not arguing that Manganaro's not being paid for the work it performed was an immaterial part of their contractual relationship. It was, of course, the very heart and soul of that relationship.

I am not ignoring in this context Patel's testimony that in December HITT offered to pay Manganaro $56,000 when Manganaro indicated that it might suspend performance. Patel testified that he offered to pay $56,000 which was not yet due. He must have been referring to a November 19, 1999 invoice submitted by Manganaro charging $56,861 as "payment due for current work." Vincent insisted that Patel never offered any money. Assuming, in any event, that I were to credit Patel's testimony and HITT had tendered the $56,861 the November invoice sought, by my calculations, a sizeable amount would still have been due.

An immense amount of confusion has been created in this case because the November 19, 1999 invoice submitted by Manganaro is mistaken and understates what was in fact due. The problem occurs because the section of the invoice that appears at Defs. Ex. 19059 contains an arithmetical error in the entry on the *Application and Certificate for Payment* that totals payments received and is entitled "Less Certificates for Payment." The entry is $389,776 which is wrong. The total amount paid by HITT to that point was $341,654 (the sum of 329,740 from Chart 5 plus 11,914 from Defs. Ex. 19033). When the correct amount is deducted from the entry entitled "Total Earned Less Retainage," the entry entitled "Current Payment Due" should be $112,628.68.[9]

9. An understanding of Manganaro's error in the November invoice makes more compre-

On December 9, 1999, or shortly thereafter, Manganaro received the check for $19,871.07. When deducted from the $112,628.68 that was in fact due, a balance of $92,757.61 was due when Patel supposedly made his offer of $56,000, which had to occur sometime between December 9, 1999 and December 20, 1999. Thus, HITT's purported offer, which left a large amount outstanding, was certainly not "substantial performance" of its obligation to pay for change work orders it approved and directed Manganaro to execute.

It is no answer to say that HITT's subjective understanding of what was due renders its performance "substantial." To assess the substantiality of HITT's performance I have to use the objective criterion of what it in fact offered against what in fact was due. The principle of "substantial performance" cannot be contorted to visit solely upon Manganaro the consequences of what might have been, at worst, a temporary[10] mutual mistake of fact in the November invoice.

More importantly, in the letter HITT wrote to Manganaro on December 20, 1999, HITT conceded that what it called "the total contract amount w[ith] approved and pending changes" was $501,603. Defs. Ex. 6002. HITT also concedes that as of December 23, 1999, it had paid Manganaro a total of $361,524, which is true.[11] *Joint Pre–Trial Statement,* Defendant's Chart, final page. Thus, HITT's own version of the billing history, correct or incorrect, established that it was $140,079 in arrears when it insisted on Manganaro's performance and then terminated Manganaro for suspending performance and demanding payment. I do not understand how a party like HITT, believing itself $140,079 in arrears, can claim to have nevertheless substantially performed its obligation to Manganaro for the work it authorized Manganaro to do.

Since HITT's reliance on the principles of substantial performance is so misplaced, it had no right whatsoever to terminate Manganaro's contract and Manganaro cannot possibly be responsible for the comple-

hensible the handwritten notes that appear at Defs. Ex. 3003–3004 and that seem to be the notes taken by someone at the negotiation in which Patel claims to have made the $56,000 offer. When one reads the notes at Defs. Ex. 3003 at the same time as the portions of the November invoice that are correct, Defs. Ex. 19059, it becomes clear that whoever made those notes is working on the premise that more than the $56,000 Patel is offering is due. The note taker knows that, as the November invoice correctly reflects, a number the note taker rounds to "496" is the total due Manganaro. This "496" matches the $496,264 that appears on the invoice in the entry entitled "Total Completed $ Stored To Date." The note taker then makes an arithmetical error in deducting the retainage which the note takes writes as "41"; it should be "49." The note taker than deducts "41" from "496" and gets "455." He then deducts "361" which seems to be the rounded total of what had been paid by HITT by December 9, 1999, *i.e.,* $341,654 + 19,871 which equals $361,525.

The note taker then deducts "361" from "455" and writes "94 owes." He then subtracts "56" from "94" and arrives at "38" and writes "not acceptable" next to the "38." A simultaneous reading of these notes and the November invoices indicate to me that, despite the mistaken November invoice, the parties to the meeting realized that the "56" Patel offered was "not acceptable" to Manganaro because "94" (actually $92,757.61) was due.

10. The testimony concerning what happened at the meeting is impossible to reconcile. In my view, whatever the parties' understanding at the beginning of the meeting, Managaro believed that $94,000 and not the $56,000 listed on the November invoice, was due. There would be no logical reason for Manganaro to refuse $56,000 if it thought that was the correct amount due.

11. Actually, HITT's total of $361,524 is wrong by one dollar. *See note 9, supra.*

tion of the work HITT then gave to others. To the precise contrary, HITT's breach of its obligation to pay Manganaro relieved Manganaro of any further obligation whatsoever under the contract:

> [I]t is a condition of each party's remaining duties to render performance to be exchanged under an exchange of performances that there be no uncured material failure by the other party to render any such performance due at an earlier time.

*Restatement,* supra, § 237.

HITT's breach of its most fundamental contractual obligation to pay for the work it approved relieved Manganaro of any further obligation under the contract, including the obligation to install the ceiling and to do the repair work on the punch list. There is, therefore, no legal premise for HITT's claimed offsets or counterclaims.

In addition, HITT never provided Manganaro its right to the 72 hours notice of HITT's intention to backcharge Manganaro for work done by others. The evidence at trial showed how important that right could be. The two witnesses who performed the "punch list" work, Hoffman and Athey, were frequently equivocal about whether the work they did could fairly and truly be attributed to Manganaro or was instead the result of damage by others. HITT's depriving Manganaro of its contractual right to notice in advance of HITT's intention to "backcharge" Manganaro for this work deprived Manganaro of its contractual right to either fix the work itself or convince HITT that Manganaro was not responsible for the back charge. I am hard-pressed to understand how HITT can terminate a contract, attempt to hold Manganaro to its contractual obligations, and, in the same breath, deprive Manganaro of a contractual benefit HITT agreed Manganaro should have before Manganaro was backcharged.

### Pre-judgment Interest

By statute, the judgment may provide for interest "on any principal sum awarded" at the rate of 9%.Va.Code Ann. §§ 8.01–382; 6.1–330.54 (2001). *See Hitachi Credit America Corp. v. Signet Bank,* 166 F.3d 614, 632–633 (4th Cir.1999)(Virginia law). Whether to award pre-judgment interest lies within the court's discretion. *Dairyland Ins. Co. v. Douthat,* 248 Va. 627, 449 S.E.2d 799, 801 (1994)(Virginia law; pre-judgment interest is discretionary, post-judgment interest is mandatory). Since 1799, the Virginia courts have exercised that discretion bearing in mind that "interest is allowed because it is natural justice that he who has the use of another's money should pay interest for it." *J.W. Creech, Inc. v. Norfolk Air Conditioning Corp.,* 237 Va. 320, 377 S.E.2d 605, 608 (1989) (*quoting Jones v. Williams,* 6 Va. 102, 104, 2 Call. 102, 106 (1799)). *Accord: Dairyland Ins. Co.,* 449 S.E.2d at 801 (pre-judgment interest is normally designed to make the plaintiff whole); *Marks v. Sanzo,* 231 Va. 350, 345 S.E.2d 263, 266 (1986)(pre-judgment interest is awarded to compensate plaintiff for loss sustained by not receiving amount due when it should have been paid). Since HITT should have paid Manganaro what was due 30 days after the invoice was received and has sine had the use of the money it did not pay Manganaro, the award of pre-judgment interest is most appropriate. I therefore award it in the following manner.

I have first divided the change work order invoices into four categories, based on the date they should have been paid. I have then taken January 22, 2002, the date of this opinion, as the date which I will use for the calculation of interest and have calculated interest on the number of

months between the date the work orders should have been paid and January 22, 2002.

| | Principal | Interest | Total |
|---|---|---|---|
| Change orders submitted Sept. 21, 1999 | $18,574.18 | $3,761.27 | $22,335.45 (Chart 1) |
| Change orders submitted Oct. 14, 1999 | $32,915.46 | $7,131.68 | $40,047.14 (Chart 2) |
| Change orders submitted Nov. 19,1999 | $10,506.33 | $1,969.94 | $12,476.26 (Chart 3) |

Once HITT wrongfully terminated Manganaro's contract on December 23, 1999, then the change order invoices submitted on December 14, 1999, became due and payable as well. I will, however, in fairness, grant HITT a reasonable time to pay them and not demand immediate payment. I will therefore award interest on the outstanding December 14, 1999, invoices as of January 14, 2000:

| | Principal | Interest | Total |
|---|---|---|---|
| Change orders submitted Dec. 14, 1999 | $ 3,412.80 | $ 614.30 | $ 4,027.10 (Chart 4) |

### Change Order Work Retainage

Under the contract, HITT was permitted to retain 10% of what Manganaro billed for change order work until the contract was completed. Once HITT terminated the contract, the retainage HITT held was due Manganaro. I therefore will grant HITT 30 days from the termination of the contract, or until January 23, 2000, within which to pay Manganaro the retainage and will award Manganaro pre-judgment interest on the amounts retained from each change order invoice, had each been paid on time:

| | |
|---|---|
| Retained from Sept. 21, 1999 invoice @ 9% interest until 1/22/02 | 4446.33 (Chart 1) |
| Retained from Oct. 14, 1999 invoice @ 9% interest until 1/22/02 | 5143.88 (Chart 2) |
| Retained from Nov. 19, 1999 invoice @ 9% interest until 1/22/02 | 3004.02 (Chart 3) |
| Retained from Dec. 14, 1999 invoice @ 9% interest until 1/22/02 | 447.46 (Chart 4) |

### Contract Work Retainage

In addition to the change order work, Manganaro performed the original work required under its contract. HITT retained 10% of the amount billed by Manganaro and, like the change order work, this retainage amount became due and payable 30 days after termination on January 23, 2000. I will award pre-judgment interest on that as well for a total of $27,753.60. *See* Chart 5.

### Unpaid Contract Work

Finally, in that portion of the Manganaro invoices entitled "current work," Manganaro sets out the contract work done in the period being invoiced. Manganaro was not paid for that work in November, 1999, or December, 1999. I will therefore award Manganaro those amounts and pre-judgment interest as well. The calculations are set out in Chart 6 and result in a total amount for unpaid contract work and contract work retainage in the amount of $73,074.65.

### Total Judgment

In Chart 7, I have added together the constituent elements of the total judgment amount and they total $177,192.66. I will not, however, enter final judgment for Manganaro in that amount at this time.

As I have pointed out, the confusion between Vincent and the project accountant and Vincent's not realizing that the December 9, 1999, check paid some of the outstanding change orders led me to do an independent analysis of the documentary evidence. Fairness requires that the parties be given an opportunity to review what I have done and correct any arithmetical errors I may have made. By a separate order I am therefore directing counsel to meet and confer and to make a joint submission of any arithmetical or other errors they believe I have made. If they cannot agree, I ask them to make separate submissions and I will resolve the controversy. By submitting any such corrections as to arithmetical or similar errors, HITT will not be deemed to be conceding the validity of my factual and legal conclusions it wishes to challenge on appeal.

Chart 1: Principal, Interest on Principal, Retainage, and Interest on Retainage Due Manganaro for Unpaid Change Order Work (Manganaro Invoice Payable 9/21/99 - Due 10/21/99)

| Change Order # or Other Description | $ Value of Work (completed) | % of Work (completed) | $ Due | Retainage (10% of $ due) | $ Due (total less retainage) | $ Paid | $ Owed |
|---|---|---|---|---|---|---|---|
| Wood Blocking | 3000 | 100 | 3000 | 300 | 2700 | 2700 | 0 |
| Metal Block G/Chg wall 5 | 369 | 0 | 369 | 36.9 | 332.1 | 0 | 332.1 |
| CD # 03 | 208 | 100 | 208 | 20.8 | 187.2 | 0 | 187.2 |
| CD # 04 (credit due HITT) | -90 | 100 | -90 | | -90 | 0 | -90 |
| CD # 05 | 1693 | 0.75 | 1269.75 | 126.98 | 1142.78 | 0 | 1142.78 |
| Repair existing | 17650 | 0.75 | 13237.5 | 1323.75 | 11913.75 | 11914 | -0.25 |
| CD # 06 | 8060 | 0.5 | 4030 | 403 | 3627 | 0 | 3627 |
| Change walls to 4C and 5 | 509 | 0.5 | 254.5 | 25.45 | 229.05 | 0 | 229.05 |
| 4th Floor Corridor Changes | 10796 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5th Floor Corridor Chnages | 13417 | 100 | 13417 | 1341.7 | 12075.3 | 0 | 12075.3 |
| Extra work order #15824 | 1190 | 100 | 1190 | 119 | 1071 | 0 | 1071 |
| Total | | | 36975.75 | 3697.58 | 33188.18 | 14614.00 | 18574.18 |

| | |
|---|---|
| Principal $ Owed (Payable 9/21/99 - Due 10/21/99) | 18574.18 |
| Interest per month @ 9% annually | 139.31 |
| Interest for 27 mos. (10/21/99-1/22/02)1 | 3761.27 |
| Total $ Owed | 22335.45 |

| | |
|---|---|
| Retainage $ Owed (Payable 12/23/99 - Due 1/23/00) | 3697.58 |
| Interest per month @ 9% annually | 27.73 |
| Interest for 24 mos. (1/23/00-1/22/02) | 665.56 |
| Total $ Owed | 4363.14 |

1 Dates are rounded to the nearest full month.

Chart 2: Principal, Interest on Principal, Retainage, and Interest on Retainage Due Managanaro for Unpaid Change Order Work (Manganaro Invoice Payable 10/14/99 - Due 11/14/99)

| Description | $ Value of Work (completed) | % of Work (completed) | $ Due | Retainage (10% of $ due) | $ Due (total less retainage) | $ Paid | $ Owed |
|---|---|---|---|---|---|---|---|
| Extra Work Order 15825 | 517 | 100 | 517 | 51.7 | 465.3 | 0 | 465.3 |
| Extra Work Order 15827 | 2085 | 100 | 2085 | 208.5 | 1876.5 | 0 | 1876.5 |
| Extra Work Order 15828 | 466 | 100 | 466 | 46.6 | 419.4 | 0 | 419.4 |
| Extra Work Order 15829 | 608 | 100 | 608 | 60.8 | 547.2 | 0 | 547.2 |
| Extra Work Order 15830 | 635 | 100 | 635 | 63.5 | 571.5 | 0 | 571.5 |
| Extra Work Order 15831 | 861 | 100 | 861 | 86.1 | 774.9 | 0 | 774.9 |
| Extra Work Order 15832 | 340 | 100 | 340 | 34 | 306 | 0 | 306 |
| Extra Work Order 15833 | 540 | 100 | 540 | 54 | 486 | 0 | 486 |
| Extra Work Order 15836 | 596 | 100 | 596 | 59.6 | 536.4 | 595.88 | -59.48 |
| Extra Work Order 15834 | 982 | 100 | 982 | 98.2 | 883.8 | 0 | 883.8 |
| Extra Work Order 15835 | 290 | 100 | 290 | 29 | 261 | 290.32 | -29.32 |
| Extra Work Order 15837 | 718 | 100 | 718 | 71.8 | 646.2 | 717.88 | -71.68 |
| Extra Work Order 16143 | 7106 | 100 | 7106 | 710.6 | 6395.4 | 4220.96 | 2174.44 |
| Extra Work Order 16144 | 510 | 100 | 510 | 51 | 459 | 0 | 459 |
| Extra Work Order 16145 | 466 | 100 | 466 | 46.6 | 419.4 | 0 | 419.4 |
| Change Order 1 | 37650 | 70 | 26355 | 2635.5 | 23719.5 | 0 | 23719.5 |
| Unallocated Payments | | | | | | 1232.83 | -1232.8 |
| Total | | | 43075.00 | 4307.5 | 38767.5 | 7057.87 | 31709.66 |

| | |
|---|---|
| Principal $ Owed (Payable 10/14/99 - Due 11/14/99) | 31709.66 |
| Interest per month @ 9% annually | 237.82 |
| Interest for 26 mos (11/14/99-1/22/02) | 6183.38 |
| Total $ Owed | 37893.04 |

| | |
|---|---|
| Retainage $ Owed (Payable 12/23/99 - Due 1/23/00) | 4307.50 |
| Interest per month @ 9% annually | 32.31 |
| Interest for 24 mos. (1/23/00-1/22/02) | 775.35 |
| Total $ Owed | 5082.85 |

Chart 3: Principal, Interest on Principal, Retainage, and Interest on Retainage Due Manganaro for Unpaid Change Order Work (Manganaro Invoice Payable 11/19/99 - Due 12/19/99)

| Change Order # or Other Description (Paid orders appear below in bold) | $ Value of Work (completed) | % of Work (completed) | $ Due | Retainage (10% of $ due) | $ Due (total less retainage) | $ Paid | $ Owed Due |
|---|---|---|---|---|---|---|---|
| CD #07 | 1077 | 100 | 1077 | 107.7 | 969.3 | 0 | 969.3 |
| Work orders 16147 | 762 | 100 | 762 | 76.2 | 685.8 | 0 | 685.8 |
| **Work order 16148** | **751** | **100** | **751** | **75.1** | **675.9** | **750.72** | **-74.82** |
| Work order 16149 | 314 | 100 | 314 | 31.4 | 282.6 | 0 | 282.6 |
| **Work order 16150** | **1601** | **100** | **1601** | **160.1** | **1440.9** | **1601.15** | **-160.25** |
| **Work order 16151** | **4701** | **100** | **4701** | **470.1** | **4230.9** | **2792.39** | **1438.51** |
| **Work order 16153** | **2209** | **100** | **2209** | **220.9** | **1988.1** | **1058** | **930.1** |
| Work order 16154 | 1446 | 100 | 1446 | 144.6 | 1301.4 | 0 | 1301.4 |
| **Work order 16155** | **5152** | **100** | **5152** | **515.2** | **4636.8** | **3060.29** | **1576.51** |
| **Work order 16156** | **352** | **100** | **352** | **35.2** | **316.8** | **351.9** | **-35.1** |
| **Work order 16158** | **235** | **100** | **235** | **23.5** | **211.5** | **234.1** | **-22.6** |
| Work order 16159 | 526 | 100 | 526 | 52.6 | 473.4 | 0 | 473.4 |
| Work order 16162 | 984 | 100 | 984 | 98.4 | 885.6 | 0 | 885.6 |
| **Work order 16160** | **936** | **100** | **936** | **93.6** | **842.4** | **986.05** | **-143.65** |
| **Work order 16161** | **1426** | **100** | **1426** | **142.6** | **1283.4** | **1426.37** | **-142.97** |
| Work order 16163 | 587 | 100 | 587 | 58.7 | 528.3 | 0 | 528.3 |
| Work order 16164 | 704 | 100 | 704 | 70.4 | 633.6 | 0 | 633.6 |
| Work order 16166 | 235 | 100 | 235 | 23.5 | 211.5 | 0 | 211.5 |
| Work order 16167 | 511 | 100 | 511 | 51.1 | 459.9 | 0 | 459.9 |
| Work order 16168 | 511 | 100 | 511 | 51.1 | 459.9 | 0 | 459.9 |
| Work order 16169 | 277 | 100 | 277 | 27.7 | 249.3 | 0 | 249.3 |
| Change Order 1 | 11295 | 100 | 11295 | 1129.5 | 10165.5 | 0 | 10165.5 |
| Total | | | 36592 | 3659.2 | 32932.8 | 12261 | 20671.83 |

| | |
|---|---|
| Principal $ Owed (Payable 11/19/99 - Due 12/19/99) | 20671.83 |
| Interest per month @ 9% annually | 155.04 |
| Interest for 25 mos. (12/19/99-1/22/02) | 3875.97 |
| Total $ Owed | 24547.80 |

Chart 3: Page 2

| | |
|---|---|
| Retainage $ Owed (Payable 12/23/99 - Due 1/23/00) | 3659.2 |
| Interest per month @ 9% annually | 27.44 |
| Interest for 24 mos. (1/23/00-1/22/02) | 658.66 |
| Total $ Owed | 4317.86 |

Chart 4: Principal, Interest on Principal, Retainage, and Interest on Retainage Due Manganaro for Unpaid Change Order Work (Manganaro Invoice Payable 12/14/99 - Due 1/14/00)

| Change Order # or Other Description | $ Value of Work (completed) | % of Work (completed) | $ Due | Retainage (10% of $ due) | $ Due (total less retainage) | $ Paid | $ Owed |
|---|---|---|---|---|---|---|---|
| Work order 16175 | 319 | 100 | 319 | 31.9 | 287.1 | 0 | 287.1 |
| Work order 16176 | 864 | 100 | 864 | 86.4 | 777.6 | 0 | 777.6 |
| Work order 16177 | 719 | 100 | 719 | 71.9 | 647.1 | 0 | 647.1 |
| Work order 16178 | 602 | 100 | 602 | 60.2 | 541.8 | 0 | 541.8 |
| Work order 16179 | 560 | 100 | 560 | 56 | 504 | 0 | 504 |
| Work order 16180 | 476 | 100 | 476 | 47.6 | 428.4 | 0 | 428.4 |
| **Work order 16182** | **252** | **100** | **252** | **25.2** | **226.8** | **552.2** | **-325.4** |
| Total | | | 3792 | 379.2 | 3412.8 | 552.2 | 2860.6 |

| | |
|---|---|
| Principal $ Owed (Payable 12/14/99 - Due 1/14/00) | 2860.6 |
| Interest per month @ 9% annually | 21.45 |
| Interest for 24 mos. (1/14/00-1/22/02) | 514.91 |
| Total $ Owed | 3375.51 |

| | |
|---|---|
| Retainage $ Owed (Payable 12/23/99 - Due 1/23/00) | 379.20 |
| Interest per month @ 9% annually | 2.84 |
| Interest for 24 mos. (1/23/00-1/22/02) | 68.26 |
| Total $ Owed | 447.46 |

**Chart 5: Retainage and Interest on Retainage Due Manganaro for Paid Contract Work (Payable 12/23/99 - Due 1/23/00)**

| Date of Invoice | $ Value of Work (completed) | Retainage (10% of $ d | $ Due (total less retainage) | Date Paid | Amount Paid | Retainage Still Due |
|---|---|---|---|---|---|---|
| 7/26/1999 | 126,810.00 | 12,681.00 | 114,129.00 | 9/9/1999 | 114,129.00 | 12,681.00 |
| 8/18/1999 | 76,945.00 | 7,694.50 | 69,250.50 | 9/23/1999 | 69,251.00 | 7,694.00 |
| 9/21/1999 | 131,358.00 | 13,135.80 | 118,222.20 | 10/21/1999 | 120,921.00 | 10,437.00 |
| 10/14/1999 | 18,147.00 | 1,814.70 | 16,332.30 | 11/18/1999 | 25,439.00 | (7,292.00) |
| Total | 353,260.00 | 35,326.00 | 317,934.00 | 145,774.00 | 329,740.00 | 23,520.00 |

| | |
|---|---|
| $ Retainage Due | 23,520.00 |
| Interest per month @ 9% annually | 176.40 |
| Interest for 24 mos (1/23/00-1/22/02) | 4,233.60 |
| Total $ Due | 27,753.60 |

**Chart 6: Principal and Interest on Principal Due Manganaro for Unpaid Contract Work**

| Principal Payable 11/14/99 - Due 12/14/99 | |
|---|---|
| $ Amount Due | 24,838.00 |
| Interest per month @ 9% annually | 186.29 |
| Interest for 25 mos (1/19/00-1/22/02) | 4657.13 |
| Total $ Due | 29,495.13 |

| Principal Payable 1/14/00 - Due 2/14/00 | |
|---|---|
| $ Amount Due | 14,902.00 |
| Interest per month @ 9% annually | 111.77 |
| Interest for 24 mos (12/14/99 -1/14/02) | 2682.36 |
| Total $ Due | 17,584.36 |

**Chart 7: Final Judgment**

**Chart 1**

| | |
|---|---|
| Principal $ Owed plus Interest | 22335.45 |
| Retainage $ Owed plus Interest | 4,363.14 |
| **Total** | **26,698.59** |

**Chart 2**

| | |
|---|---|
| Principal $ Owed plus Interest | 37,893.04 |
| Retainage $ Owed plus Interest | 5,079.31 |
| **Total** | **42,972.35** |

**Chart 3**

| | |
|---|---|
| Principal $ Owed plus Interest | 24547.8 |
| Retainage $ Owed plus Interest | 4,317.86 |
| **Total** | **28,865.66** |

**Chart 4**

| | |
|---|---|
| Principal $ Owed plus Interest | 3375.51 |
| Retainage $ Owed plus Interest | 447.46 |
| **Total** | **3,822.97** |

**Chart 5**

| | |
|---|---|
| Retainage $ Owed plus Interest | 27,753.60 |
| **Total** | **27,753.60** |

**Chart 6**

| | |
|---|---|
| Principal $ Owed plus Interest | 29,495.13 |
| Principal $ Owed plus Interest | 17,584.36 |
| **Total** | **47,079.49** |

**CUMULATIVE TOTALS**

| | |
|---|---|
| Chart 1 Total | 26,698.59 |
| Chart 2 Total | 42,972.35 |
| Chart 3 Total | 28,865.66 |
| Chart 4 Total | 3,822.97 |
| Chart 5 Total | 27,753.60 |
| Chart 6 Total | 47,079.49 |

| | |
|---|---|
| **FINAL JUDGMENT FOR MANGANARO** | **177,192.66** |